# Illinois Official Reports

## Appellate Court

*People v. Duran*, 2016 IL App (1st) 152678

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOSE DURAN, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-2678 |
| Filed | October 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-06164; the Hon. Rickey Jones, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Kathryn F. Sodetz, Assistant State's Attorneys, of counsel), for the People.<br><br>John Paul Carroll, of Naperville, for appellee. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Rochford and Delort concurred in the judgment and opinion. |

¶ 1    The defendant, Jose Duran, was charged by indictment with one count of possession with intent to deliver 900 or more grams of methamphetamine in violation of sections 55(a)(1) and 55(a)(2)(F) of the Methamphetamine Control and Community Protection Act (720 ILCS 646/55(a)(1), (a)(2)(F) (West 2012)). The defendant filed a motion to quash his arrest and suppress evidence, contending, *inter alia*, that the search of the vehicle in which he was riding and the attaché bag in which the methamphetamine was found was conducted without consent, articulable factual justification, or probable cause. Following an evidentiary hearing, the trial court granted the defendant's motion, finding that the defendant was arrested without probable cause and, as a consequence, the seizure of the methamphetamine was unlawful. The State filed a motion for reconsideration of the trial court's order, which was denied. Thereafter, the State filed a notice of substantial impairment and a notice of appeal. For the reasons which follow, we reverse the trial court's order granting the defendant's motion to quash arrest and suppress evidence.

¶ 2    When reviewing a ruling on a motion to suppress evidence, we accord great deference to the trial court's factual findings, which we will reverse only if those findings are against the manifest weight of the evidence; however, we review *de novo* the ultimate question of the legal challenge to the trial court's ruling. *People v. Sutherland*, 223 Ill. 2d 187, 196-97 (2006).

¶ 3    After conducting an evidentiary hearing on the defendant's motion to quash arrest and suppress evidence, the trial court found the testimony of the State's witnesses to be credible. The following factual recitation is based upon that testimony.

¶ 4    On February 26, 2013, Chicago police officers and agents of the federal Drug Enforcement Administration (DEA) were assigned to the DEA Airport Task Force Group. On that date, Chicago Police Sergeant Dennis O'Connor received a telephone call from DEA Special Agent Leach stationed in San Diego, California, informing him that information had been received from a confidential informant that a woman named Valerie Santos "would be transporting narcotics from San Diego to Chicago O'Hare Airport." Agent Leach did not disclose the date that the transportation was to take place or the type of narcotics involved. He did, however, inform Sergeant O'Connor that Santos would be staying at the Whitehall Hotel located at 105 East Delaware Place in Chicago but did not specify the date that she would be checking in. Agent Leach never gave Sergeant O'Conner any information as to the reliability of the confidential informant.

¶ 5    Sergeant O'Connor relayed the information that he received to DEA Agent Glynn, DEA Agent Aristidis Karabinas, and Chicago Police Officer Raymond Caballero; all of whom are members of the DEA Airport Task Force Group. Based upon that information, Agents Glynn and Karabinas and Officer Caballero went to the Whitehall Hotel to watch for Santos. Upon arrival at the hotel, Agent Karabinas ascertained from the hotel manager that a Ms. Santos was registered for that day. At approximately 4:45 p.m., a taxi arrived at the hotel and a woman exited. Agent Karabinas recognized the woman as Valarie Santos from a picture he had received from the DEA's California office. At the time that Santos exited the taxi, she was carrying a black attaché bag. Agent Karabinas stationed himself in a room across from the one in which Santos was registered, while Agent Glynn and Officer Caballero remained in the hotel lobby. From his vantage point, Agent Karabinas was able to see Santos enter her hotel room carrying the black attaché bag. About two hours later, Agent Karabinas saw a man and a

woman enter Santos's room where they remained for several minutes. When the man left Santos's room, he was carrying the black attaché bag. Agent Karabinas telephoned the other members of his team who were conducting surveillance in the hotel lobby and informed them that a man and a woman had entered Santos's room and left several minutes later. The man and the woman were observed leaving the hotel and getting into a black Cadillac Escalade. The woman drove the vehicle while the man rode in the passenger's seat. Agent Karabinas later learned that the woman was Erica Armas and the man was the defendant.

¶ 6     Agent Glynn and Officer Caballero got into separate vehicles and followed the Cadillac Escalade as it went west from the hotel to the Dan Ryan Expressway and then proceeded south on the Stevenson Expressway. The Cadillac exited the expressway at Kedzie Avenue and travelled northbound. Using the Chicago police radio frequency, one of the members of the DEA team who was following the Cadillac requested assistance from a marked police vehicle in stopping the Cadillac. At approximately 7:40 p.m. the Cadillac reached 33rd Street and was seen by uniformed Chicago police officers Perez and Sanchez, who were patrolling in a marked police vehicle. Officer Perez stated that he had heard a broadcast over the police radio that Chicago police officers and DEA agents were following a black Cadillac Escalade that was "suspected of having narcotics in it." Officer Sanchez, who was driving, made a U-turn and followed the Cadillac northbound on Kedzie Avenue. After about two blocks, officers Sanchez and Perez stopped the Cadillac for traveling too fast for conditions. The officers exited their marked patrol car and approached the Cadillac. Officer Sanchez spoke to the driver, Armas, and obtained her driver's license and insurance card. Officers Sanchez and Perez then returned to their vehicle.

¶ 7     Officer Caballero stopped his vehicle directly behind the marked squad car and approached the Cadillac. He informed Armas that they were conducting a narcotics investigation and asked her if they could search the vehicle. According to Officer Caballero, Armas gave him oral permission to search the Cadillac. Armas and the defendant exited the Cadillac, and the defendant was immediately handcuffed and placed in the marked police car.

¶ 8     Approximately five minutes after the Cadillac Escalade was pulled over, Agent Glynn, a DEA narcotics canine officer, arrived on the scene with a dog that is certified to detect narcotics, including methamphetamine. Officer Caballero informed Agent Glynn that Armas had given her consent for a search of the Cadillac. Agent Glynn had the dog search the exterior of the Cadillac and then allowed the dog to go inside of the vehicle. The dog gave an alert for the presence of narcotics upon sniffing the black attaché bag, which was located on the rear seat of the vehicle. The bag was removed from the vehicle, opened, and a powdery substance was found inside. According to Officer Caballero, it was at that time that Armas and the defendant were placed under arrest. After being tested, the powdery substance in the attaché bag was found to be methamphetamine.

¶ 9     The defendant testified at the evidentiary hearing. He admitted that he and Armas went to Santos's hotel room and that he left carrying the black attaché bag, which he placed in the rear of the Cadillac Escalade. He stated that, at the time that the vehicle was stopped by the police, Armas was driving and he was seated in the front passenger's seat. According to the defendant, as soon as the Cadillac was stopped, he was handcuffed and taken to a marked police car. He testified that he could not hear any of the conversations that Armas had with the police officers. The defendant stated that he never gave the police permission to search the attaché bag.

Additionally, he admitted that he was not the owner of the Cadillac Escalade and that Armas owned the vehicle.

¶ 10    Following the evidentiary hearing, the trial court found that the police officers "had a reasonable articulable suspicion to believe that the defendant and others were involved in criminal narcotics activity and that Ms. Armas was driving too fast for road conditions." The trial court concluded that the officers were "justified in stopping the vehicle, detaining the occupants, and having them step out of the vehicle to conduct a *Terry* investigation." The trial court also found that the officers obtained valid consent from Armas to search her vehicle and that the dog's alert upon sniffing the attaché bag was "sufficiently reliable to establish probable cause to believe that the bag contained illegal drugs and, therefore, the officers were justified in searching the bag, seizing the drugs, and arresting the defendant and Ms. Armas." The trial court also found that the defendant's testimony regarding his detention and custody after the Cadillac was stopped was credible and, based on that testimony, found that the defendant remained handcuffed and confined in a police car from the time that he was removed from the Cadillac. The trial court concluded that the defendant was arrested without probable cause prior to the dog's alert to the presence of narcotics in the attaché bag and, therefore, "the seizure was unlawful." As a consequence, the trial court granted the defendant's motion to quash arrest and suppress evidence.

¶ 11    In urging reversal of the trial court's order granting the defendant's motion, the State makes a number of arguments. However, in its brief, the State has commingled arguments which should have been addressed separately, leaving us to unravel the package and attempt to address each of the arguments in a logical sequence.

¶ 12    We first address the State's contention that the trial court erred in finding that the defendant was under arrest when he was handcuffed and confined in a police car immediately after being removed from the Cadillac. The State contends that, assuming the defendant was handcuffed when he exited the Cadillac, his detention was incidental to a valid investigatory stop (see *Terry v. Ohio*, 392 U.S. 1 (1968)), and the fact that he was handcuffed did not transform the *Terry* type stop into an arrest (*People v. Colyar*, 2013 IL 111835, ¶ 46; see also *People v. Waddell*, 190 Ill. App. 3d 914, 928 (1989)). The State argues that, because, as the trial court found, the officers had reasonable suspicion that the defendant was involved in criminal narcotic activity, they were justified in handcuffing the defendant as a safety precaution without transforming his temporary detention incident to a valid traffic stop into an arrest. We agree.

¶ 13    The fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 6) guarantee the right of individuals to be free from unreasonable searches and seizures. Generally, the seizure of an individual without a warrant is valid only if supported by probable cause. *People v. Jackson*, 232 Ill. 2d 246, 274-75 (2009). However, a limited exception exists when, under appropriate circumstances, a police officer briefly stops a person for investigatory purposes. *Terry*, 392 U.S. at 21-22. Such investigatory stops have come to be known as *Terry* stops. A police officer may briefly detain an individual for questioning if the officer reasonably believes that the person has committed, or is about to commit, a crime. *Id.* at 22.

¶ 14    The decision to stop a motor vehicle is reasonable when the police have probable cause to believe that a traffic violation has been committed. *Whren v. United States*, 517 U.S. 806, 810 (1996). As the occupants of a motor vehicle which is stopped by the police are considered to

have been seized within the meaning of the fourth amendment at the moment that the vehicle is stopped (*Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997)), their detention during the traffic stop is subject to the requirement of reasonableness. *Whren*, 517 U.S. at 809-10. The reasonableness of a traffic stop and the resulting detention of its occupants are analyzed pursuant to the principles articulated by the Supreme Court in *Terry*. *People v. Gonzalez*, 204 Ill. 2d 220, 226 (2003). Consequently, detention following a valid traffic stop must be limited in both scope and duration. *People v. Johnson*, 408 Ill. App. 3d 107, 113 (2010).

¶ 15 The defendant does not contend, nor could he, that the initial stop of the vehicle in which he was riding was unreasonable. As the trial court found, the police were justified in stopping the vehicle based on their observation that it was being driven too fast for conditions. Nevertheless, the actions of the police after stopping the Cadillac must have been reasonably related in scope to the circumstances which justified the vehicle being stopped in the first place.

¶ 16 Handcuffing is the type of activity that may convert an otherwise lawful investigatory stop into an arrest because it heightens the intrusiveness of a temporary detention. *People v. Wells*, 403 Ill. App. 3d 849, 857 (2010). However, the use of handcuffs does not, by itself, convert a lawful investigatory stop into an arrest. *People v. Arnold*, 394 Ill. App. 3d 63, 71 (2009).

¶ 17 In this case, not only was the vehicle in which the defendant was riding stopped based on the commission of a traffic violation, but the trial court also found that the officers had reason to believe that the defendant was involved in criminal narcotics activity. The defendant, however, appears to dispute the trial court's finding in that regard. We believe that the trial court's finding is supported by the evidence introduced at the evidentiary hearing.

¶ 18 A *Terry* type stop is permissible when the police have reasonable suspicion, based upon specific articulable facts, that a person has committed a crime. *People v. Croft*, 346 Ill. App. 3d 669, 674-75 (2004). In determining whether there was a reasonable suspicion of criminal activity, we consider the totality of the circumstances. *Id.* at 675.

¶ 19 In this case, Sergeant O'Conner received a telephone call from DEA Agent Leach who stated that that he had received information from an unidentified confidential informant that Valerie Santos would be transporting narcotics to Chicago from San Diego and that she would be staying at the Whitehall Hotel. No date was given for the transportation or when Santos would be at the hotel. On that same date, DEA agents and a Chicago police officer acting on that information went to the Whitehall Hotel and conducted surveillance. They ascertained that a Ms. Santos was registered as a guest at the hotel. Valarie Santos was seen entering the hotel carrying a black attaché bag and going to her room. Approximately two hours later, Armas and the defendant were seen entering Santos's room and exiting several minutes later with the defendant carrying the black attaché bag. Thereafter, the defendant and Armas were observed getting into a Cadillac Escalade into which the defendant had placed the attaché bag.

¶ 20 The information relayed to Sergeant O'Conner standing alone did not demonstrate the basis of the confidential informant's knowledge or the veracity of the information. Therefore, without more, the information relayed by Agent Leach was insufficient to provide the reasonable suspicion necessary to support a *Terry* type stop of the vehicle in which the defendant was riding. The fourth amendment requires more than some minimal level of objective justification for making a *Terry* stop. *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 217 (1984). However, independent corroboration of significant aspects of the informant's predictions can impart a degree of reliability on the informant's

- 5 -

other allegations sufficient to support an investigative stop. *Alabama v. White*, 496 U.S. 325, 330-31 (1990). Even corroboration of innocent details can be sufficient to establish reasonable suspicion of criminal activity. See *Illinois v. Gates*, 462 U.S. 213, 243-46 (1983); *Draper v. United States*, 358 U.S. 307, 309-13 (1959).

¶ 21    In addition to reporting that Valerie Santos would be transporting narcotics from San Diego to Chicago, the confidential informant predicted that Valerie Santos would be staying at the Whitehall Hotel. In possession of a picture of Valarie Santos, which had been supplied by the DEA's California office, DEA agents and a Chicago police officer went to the Whitehall Hotel, verified that a Ms. Santos was registered as a guest, and observed her enter the hotel and go to her room carrying a black attaché bag. Two hours after Santos was observed entering her room, the defendant and Armas were seen going into Santos's room and exiting several minutes later with the defendant carrying a black attaché bag like the one that Santos had when she entered the hotel. Thereafter, the defendant was observed placing the attaché bag in the Cadillac Escalade.

¶ 22    As was the case in *Alabama v. White*, the confidential informant in this case predicted future actions of a third party. Only someone familiar with Santos's affairs could have predicted that she would be in Chicago and staying at the Whitehall Hotel; information which the police corroborated. In addition to the corroboration of Santos's predicted activity, the officers observed the defendant exiting Santos's hotel room after a very brief stay carrying a black attaché bag like the one Santos entered the hotel with. Under a totality of the circumstances analysis, we believe that the facts of this case support the trial court's finding that the officers had a reasonable articulable suspicion that the defendant was involved in criminal narcotics activity, justifying an investigative stop of the vehicle in which the defendant was riding.

¶ 23    In *Waddell*, 190 Ill. App. 3d at 927, the court held that handcuffing the defendant in that case following a traffic stop did not convert a lawful *Terry* stop into an arrest as "there is nothing unreasonable about police officers being apprehensive concerning the risks inherent in interdicting drug traffic." We find no reason to deviate from that rationale. We believe, therefore, that the trial court erred in finding that the defendant was arrested prior to the dog's narcotics alert based solely upon the fact that he was handcuffed and placed in a police car upon exiting the Cadillac.

¶ 24    Having determined that the initial stop of the vehicle in which the defendant was riding was justified both by reason of the traffic violation which the police observed and the reasonable suspicion which the officers had that the occupants were engaged in criminal narcotics activity and having found that the defendant was not under arrest solely by reason of having been handcuffed and placed in a police car, we must next address the question of whether the resulting detention of the defendant prior to the discovery of the methamphetamine was reasonable in both scope and duration.

¶ 25    The United States Supreme Court has held that an otherwise lawful seizure of an individual during a traffic stop becomes an unlawful detention if it is prolonged beyond the time reasonably required to complete the purpose of the seizure. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Relying upon the holding in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015), the defendant argues that his roadside detention following the traffic stop of the vehicle in which he was riding was unreasonably prolonged in order to conduct the dog sniff and, as such, the search of the attaché bag and the seizure of the contents thereof violated the

constitutional proscription against unreasonable searches and seizures. We believe that the defendant's reliance upon the holding in *Rodriguez* is misplaced.

¶ 26    The question resolved in *Rodriguez* was "whether police routinely may extend an otherwise-completed traffic stop, *absent reasonable suspicion*, in order to conduct a dog sniff." (Emphasis added.) *Id.* at ___, 135 S. Ct. at 1614. And, although the Supreme Court held that a "traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket" (*id.* at ___, 135 S. Ct. at 1614-15 (quoting *Caballes*, 543 U.S. at 407)), the Supreme Court declined to address the question of whether the police had reasonable suspicion of criminal activity which justified the detention of the defendant after the tasks attendant to the traffic stop had been completed (*id.* at ___, 135 S. Ct. at 1616-17).

¶ 27    In this case, Agent Glynn arrived on the scene about five minutes after officers Perez and Sanchez had stopped the vehicle in which the defendant was riding. The uniformed officers obtained Armas's driver's license and insurance card and returned to their vehicle. Thereafter, Officer Caballero requested that Agent Glynn have the dog perform a sniff investigation of the Cadillac. Without more, a strong argument could be made that the defendant's detention was prolonged beyond the time necessary for officers Sanchez and Perez to complete their traffic-related tasks, rendering his continued detention an unreasonable seizure. This is especially true in light of the fact that no traffic citation or warning was issued to Armas. However, the officers in this case also had a reasonable suspicion that the defendant was engaged in criminal narcotics activity. In addition, Armas, the owner of the Cadillac Escalade consented to a search of the vehicle. Under these circumstances, we do not believe that the defendant's continued detention for the five minutes that it took for Agent Glynn to arrive on the scene with the dog and the time it took to complete the dog sniff exceeded the bounds of reasonableness to the point of becoming unlawful.

¶ 28    The defendant also argues that the trial court's suppression of the evidence seized from the attaché bag should be affirmed because it is the product of an illegal search. The defendant contends that he had a legitimate expectation of privacy in the contents of the attaché bag which did not evaporate when he became a passenger in the vehicle in which it was found. He asserts that the police knew that he had been in possession of the attaché bag and that he never gave consent to it being searched. For the reasons which follow, we find no merit is the argument that the search of the attaché bag violated the defendant's constitutional protection from unreasonable searches.

¶ 29    As noted earlier, both the United States Constitution and the Illinois Constitution of 1970 protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. However, as the defendant has not argued that our state constitution provides broader protection than the fourth amendment to the United States Constitution, we will confine our analysis to fourth amendment jurisprudence. See *Sutherland*, 223 Ill. 2d at 229.

¶ 30    We begin our analysis with the search of the vehicle in which the attaché bag was located. An individual may consent to a search of her property conducted without a warrant (*People v. Phillips*, 264 Ill. App. 3d 213, 217 (1994)), and fourth amendment guarantees are not implicated when police conduct a search pursuant to a voluntary consent (*Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *People v. Cardenas*, 237 Ill. App. 3d 584, 587 (1992)). In this case, it was the defendant's testimony that the Cadillac in which he was riding belonged to Armas, and

the testimony at the evidentiary hearing supports the trial court's finding that the police obtained valid consent from Armas to search the vehicle. The defendant has not argued before this court that he had any legitimate expectation of privacy in the Cadillac itself; nor could he. He did not own the vehicle and there is no evidence in the record before us that he had any possessory interest in the vehicle, had previously used the vehicle, or that he had a right to control others use of the vehicle. Consequently, he could not challenge the search of either the exterior or interior of the Cadillac.

¶ 31 Pursuant to the consent received from Armas, Agent Glynn had the dog sniff both the outside and inside of the Cadillac. Upon sniffing the attaché bag located within the vehicle, the dog alerted to the presence of narcotics.

¶ 32 Having obtained Armas's consent to search the vehicle, the dog sniff itself was not a search subject to the fourth amendment unless the sniff itself infringed upon the defendant's constitutionally protected legitimate interest in privacy. *Caballes*, 543 U.S. at 408-09. However, the possession of narcotics cannot be deemed "legitimate," and as a consequence, the dog sniff in this case which only revealed the presence of narcotics did not compromise any legitimate privacy interest possessed by the defendant. *Id.* Once the dog alerted the police to the presence of narcotics in the attaché bag, they had probable cause to search the bag, which revealed the methamphetamine located therein. *United States v. Carrazco*, 91 F.3d 65, 67 (8th Cir. 1996).

¶ 33 Based upon the foregoing analysis, we find that the vehicle in which the defendant was riding was lawfully stopped, he was lawfully detained, and the search of the attaché bag in which the methamphetamine was found was conducted after the police had probable cause to believe that narcotics were located therein. We conclude, therefore, that the trial court erred in granting the defendant's motion to quash arrest and suppress evidence.

¶ 34 Although we have concluded that the trial court erred in finding the defendant was arrested without probable cause when he was handcuffed and placed in a police car before the dog alerted to the presence of narcotics in the attaché bag, we would still reverse the trial court's order even if the defendant had been unlawfully arrested.

¶ 35 When the arrest of an individual is tainted by illegality, evidence obtained as a result of the illegal arrest may be subject to the exclusionary rule and suppressed. *People v. Johnson*, 237 Ill. 2d 81, 92 (2010). However, a determination that an individual has been unlawfully arrested does not necessarily resolve the issue of whether subsequently obtained evidence is admissible. *Id.* The relevant inquiry is whether the evidence was derived from the illegal arrest or whether it was obtained by means sufficiently distinguishable from the taint of the illegal arrest. *Id.*; *People v. Lovejoy*, 235 Ill. 2d 97, 130 (2009).

¶ 36 In this case, the Cadillac in which the defendant was riding was lawfully stopped. After the owner of the vehicle, Armas, gave consent for a search of the vehicle, a narcotics-detection dog sniffed the exterior and interior of the Cadillac and alerted to the presence of narcotics in the attaché bag, giving the police probable cause to search the bag. It is clear that the methamphetamine found in the attaché bag was not obtained as a result of the defendant's alleged arrest and should not have been suppressed. See *Johnson*, 237 Ill. 2d at 92-93.

¶ 37 For the reasons stated, we reverse the trial court's order granting the defendant's motion to quash arrest and suppress evidence and remand the matter for further proceedings consistent with the opinions expressed herein.

¶ 38        Reversed and remanded.