2019 IL App (1st) 160640
No. 1-16-0640
Opinion filed July 25, 2019
Modified on denial of rehearing September 30, 2019

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 15846 |
| | ) | |
| CORDELL BASS, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion and supplemental opinion upon denial of rehearing.
Justice Pucinski concurred in the judgment, opinion, and opinion upon denial of rehearing.
Justice Mason* concurred in part and dissented in part, with opinion.
Justice Coghlan dissented upon denial of rehearing, with opinion.

**OPINION**

¶ 1    Cordell Bass was arrested solely on the authority of what the Chicago Police Department

calls an "investigative alert." Department regulations allow officers to arrest people on the basis

---

*On Justice Mason's retirement, Justice Coghlan was substituted on the panel. Justice Coghlan has listened to the recording of oral argument and has reviewed the briefs and the State's petition for rehearing.

of an alert where there is probable cause to believe the suspect has committed a crime. But, the regulations allow for police supervisors to internally make that probable cause determination. Officers are not required to take their case for probable cause to a judge, as they would for an arrest warrant. We are asked to determine whether this practice is constitutional. We hold that it is not.

¶ 2     Our conclusion is based on the Illinois Constitution. Often (too often for some), if a provision of our constitution dovetails with one in the United States Constitution, we look only to judicial interpretation of the United States Constitution to answer constitutional questions. Our supreme court calls this the "limited lockstep" approach to Illinois constitutional interpretation. We only can depart from "limited lockstep" if the text and history of our constitution differs from the federal constitution. We also can look to preexisting Illinois law or any traditions, values, or public attitudes that qualify as unique to our State. *People v. Caballes*, 221 Ill. 2d 282, 309-10 (2006).

¶ 3     A critical difference exists between the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and Illinois's search and seizure clause. Ill. Const. 1970, art. I, § 6. In the portion of the text that pertains to issuing a warrant, the United States Constitution requires probable cause supported by "oath or affirmation" (U.S. Const., amend. IV) the Illinois Constitution requires probable cause supported by "affidavit." Ill. Const. 1970, art. I, § 6. The Illinois Supreme Court, in cases decided close in time to the amendment of our constitution, explained that the requirement of an affidavit goes "a step beyond" the United States Constitution. Importantly, those cases do not limit their reasoning to just the requirement for a warrant but apply it to the requirement for probable cause more generally. A long legal

tradition in this State requires more than just the word of an official accuser (usually a police officer) to support a finding of probable cause.

¶ 4     Against this rule, the Chicago Police Department has a system where an officer reports a suspected crime to his or her supervisor, not a judge. If the supervisor agrees that there is probable cause, an investigative alert goes out ordering the arrest of a suspect. In other words, police officers can obtain approval for arrests without the one thing the framers of the Illinois Constitution thought most essential—the presentation of sworn facts to a judge.

¶ 5     Notably, investigative alerts are not issued instantaneously; in many cases, investigative alerts take the same or more time to procure than a warrant. We understand that some may worry that finding investigative alerts unconstitutional will hamper legitimate law enforcement efforts to prevent crime. We take those concerns seriously, but in Illinois, only the Chicago Police Department appears to use investigative alerts. So our decision merely puts the Chicago police officers on equal footing with their colleagues in other departments throughout the State of Illinois.

¶ 6                         Background

¶ 7     On July 27, 2014, Bass and his girlfriend spent the night at the house of the victim, T.P. In the morning, while T.P.'s boyfriend was in the bathroom, Bass went into T.P.'s room and molested her as she slept. When T.P. turned around and saw Bass, she screamed causing Bass to flee. T.P. reported the incident to police, who issued an investigative alert for Bass's arrest. The investigative alert summarized the incident as reported by T.P. and stated that there was probable cause to arrest Bass. Significantly, the officers did not get a warrant for Bass's arrest.

¶ 8     Almost three weeks later, officers pulled over a red minivan for running a red light. Bass was a passenger. For safety reasons, the officers had all of the passengers get out of the van. The

officers did not observe Bass violate any laws or act suspiciously. But, they ran a "name check" on him and discovered the investigative alert. On the basis of the investigative alert, the officers arrested Bass.

¶ 9    After his arrest, Bass gave a statement to investigators. He admitted that he went into T.P.'s bedroom because she "looked good." He lifted up the sheets and saw that her underwear was partially off. He said that he started to kiss "along the crease of her buttocks, but did not go inside it." Bass stated that T.P. woke up and started yelling before he touched her vagina.

¶ 10    Ahead of trial, Bass moved to quash his arrest and suppress his statement. Officers Jeffrey Carrero and Salvador Serrano testified that they were patrolling in the area of Marquette Road and Normal Boulevard in Chicago in a marked squad car at about 1:00 a.m. when they saw a red van fail to stop at a red light. Officer Carrero pulled over the van, told the driver the reason for the stop, and asked the driver for his license. The officer could not recall whether the driver produced his license, but he did ask the driver to get out of the car, which is his usual practice when a driver fails to provide a license. After running a Law Enforcement Agencies Data System check on the driver (based on either a license, an Illinois identification card, or the driver's name), Officer Carrero gave the driver a verbal warning for running the red light but did not issue a ticket for failing to have a license. Officer Carrero also completed a "TSS card," which documents the driver's information, the vehicle's information, the reason for the stop, and whether the vehicle was searched.

¶ 11    As Officer Carrero approached the driver, Officer Serrano approached the front passenger side, where Bass was sitting. Officer Serrano asked Bass and the rear passengers to get out for safety reasons. Neither officer saw Bass make any furtive movements or violate any laws.

¶ 12    Bass gave Officer Serrano his driver's license. Officer Carrero performed a "name check" and discovered an active investigative alert on Bass that read:

"The victim was asleep in her bed when she was awakened by someone licking her anus. The victim turned around and observed the offender who is her sister's boyfriend and who was spending the night at the victim's residence with her sister. The victim did not give the offender permission to lick her anus."

After a total of eight minutes, the officers arrested Bass.

¶ 13    Detective Dwayne Davis explained the circumstances under which he issued the investigative alert. Detective Davis testified that he interviewed T.P. and her boyfriend two days after the incident. T.P. told the detective that she awoke from sleep to discover Bass licking her buttocks and moving into her groin without her consent. T.P's boyfriend told Davis that he saw Bass leave T.P.'s bedroom. Both identified Bass from a photo array. Based on these interviews, Detective Davis put out an investigative alert for Bass but did not obtain an arrest warrant.

¶ 14    Following argument, the trial court denied the motion to suppress, finding that officer safety justified ordering the passengers out of the car and that the name check was likewise legitimate. Further, the court held that because the State presented the testimony of the detective who promulgated the investigative alert, probable cause supported Bass's arrest.

¶ 15    At trial, T.P. testified that she lives with her boyfriend, Dunkin, and her three children. In July 2014, her sister, Tina, and Tina's three children were staying with them. T.P. had known Bass, who was dating Tina, for a year and a half, and he occasionally stayed over as well.

¶ 16    Everyone—T.P., Dunkin, Tina, Bass, and the six children—were staying at the house on July 27, 2014. After a family gathering, Dunkin went to bed at 9 p.m. and Tina joined him at 10 p.m. T.P. went to bed in only a T-shirt and underwear. In the morning, as T.P. slept facedown

she awoke to someone touching the lower part of her butt cheeks going into her vagina. T.P. felt a tongue on her anus, and thinking it was Dunkin, she lifted her body up to encourage him. After she lifted her body up, she felt a tongue in her vagina. At that point, T.P. turned over and saw that it was Bass, not Dunkin. T.P. yelled for her sister and jumped out of bed. Dunkin, who had been in the bathroom, came to the door to ask what was wrong. T.P. told him, "this [expletive] was licking my a\*\*\*." Bass then ran out of the residence, and T.P. and Dunkin called the police. The next day, T.P. identified Bass as in a photo array.

¶ 17    Dunkin explained that when he came back from the bathroom he asked Bass what was wrong with T.P. Bass said, "I made a mistake. I walked in the room. She had no clothes." Dunkin went into the bedroom, and T.P. explained that Bass had licked her. Dunkin also identified Bass in a photo array the next day.

¶ 18    Detective Davis testified that Bass gave a statement after being arrested during the traffic stop. Bass said that he had come back into the house after walking with Tina and saw T.P. lying in her bed covered by a sheet. Bass lifted up the sheet, saw T.P.'s underwear was in the middle of her buttocks. He admitted to kissing the crease of her buttocks but denied "going inside." Bass explained that he kissed T.P. because she "looked good" and also because he wanted to "get back" at Tina, who had been talking to other men. Bass said that he ran when T.P. started yelling.

¶ 19    After trial, the court found Bass guilty on a single count of criminal sexual assault. The court found T.P., her boyfriend, and Detective Davis credible and also referenced Bass's statement to the detective that T.P. "looked good" as evidence that he took advantage of the situation despite knowing he did not have T.P.'s consent. Following the denial of his posttrial motion, the trial court sentenced Bass to eight years in prison.

¶ 20                                    Analysis

¶ 21    Bass raises three arguments: (i) the evidence is insufficient to prove that he knew T.P. was unable to give knowing consent, (ii) the trial court erred in denying his motion to suppress statements, and (iii) various monetary assessments should be vacated. We agree that the trial court erroneously denied Bass's motion to suppress, and we reverse his conviction and remand for a new trial. We begin our analysis, however, with Bass's claim as to the sufficiency of the evidence as it will be relevant to our discussion of the remedy.

¶ 22                          A. Sufficiency of the Evidence

¶ 23    Bass argues that the State failed to prove that he did not know of T.P.'s incapability of giving knowing consent. When we review a challenge to the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements beyond a reasonable doubt. *People v. Newton*, 2018 IL 122958, ¶ 24. We draw all reasonable inferences in favor of the prosecution, and we will not reverse the trial court's judgment unless the evidence is so "unreasonable, improbable, or unsatisfactory" as to raise a reasonable doubt of Bass's guilt. *Id.*

¶ 24    Bass was charged with criminal sexual assault under section 11-1.20(a)(2) of the Criminal Code of 2012, which provides that a person commits criminal sexual assault by committing "an act of sexual penetration" and "knows that the victim is unable to understand the nature of the act or is unable to give knowing consent." 720 ILCS 5/11-1.20(a)(2) (West 2014). On appeal, Bass challenges the State's evidence on the element of knowledge. By statute, Bass acted with knowledge that T.P. was unable to give knowing consent if he was "consciously aware *** that those circumstances exist." 720 ILCS 5/4-5(a) (West 2014). Ordinarily, circumstantial evidence proves knowledge, and it can be inferred from a defendant's acts,

statements, or conduct, as well as surrounding circumstances. *People v. Fleming*, 2013 IL App (1st) 120386, ¶ 74. In cases arising under section 11-1.20(a)(2), our supreme court has emphasized a case by case approach to determine the defendant's "particular knowledge" of a victim's ability to give knowing consent. *People v. Lloyd*, 2013 IL 113510, ¶ 33.

¶ 25    The State presented more than sufficient evidence to prove Bass knew T.P. unable to give *knowing* consent. When Bass entered and began licking her, T.P. was asleep on her stomach in the bedroom she shared with her boyfriend. This cuts against Bass's argument on appeal that he made no attempt to conceal his identity or trick T.P.—she could not see him, and he knew she could not see him. While T.P. may have awoken before Bass committed any act of penetration, the fact remains that T.P. had no reason to suspect that anyone other than Dunkin, her boyfriend, was performing these acts.

¶ 26    The rest of State's evidence also supports the conclusion that Bass knew T.P. had not given knowing consent. The fact that Bass was T.P.'s sister's boyfriend alone gives rise to an inference that Bass knew T.P. would not welcome his advances. Further, his explanation to Detective Davis that he committed these acts because he thought T.P. "looked good" reveals much. He did not attempt to justify his behavior by claiming that he believed T.P. had given him permission to enter her bedroom and engage in sex acts. T.P.'s maneuvering of her body to give Bass easier access to her private areas proves only that T.P. consented to an act. But this was not *knowing* consent within the meaning of the statute, as there was no reason for T.P. to believe that Bass was performing these acts or for Bass to believe that T.P. knew it was Bass. For these reasons, we believe the evidence was sufficient to sustain Bass's conviction.

¶ 27                                  B. Motion to Suppress

¶ 28 Bass argues that the trial court erred when it denied his motion to suppress on two grounds. He primarily argues that the traffic stop was unlawfully extended under *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015), because asking him, as a passenger, for his identification and running a name check unreasonably prolonged the stop for reasons unrelated to its initial purpose. Alternatively, Bass argues that even if the stop was conducted in a constitutionally permissible manner, the information that the officers learned after running the name check—in the form of an investigative alert—constitutes an unconstitutional basis on which to arrest him. We agree with both of Bass's arguments.

¶ 29 We review a motion to suppress with a two-part standard of review, accepting the facts as found by the trial court unless those findings are manifestly erroneous. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). Applying *de novo* review, we may make our own determinations as to whether the facts justify the challenged police action as a matter of law. *Harris*, 228 Ill. 2d at 230.

¶ 30 *Investigative Alerts in Illinois Cases*

¶ 31 The Chicago Police Department employs two types of investigative alerts. The first is called "Investigative Alert/Probable Cause to Arrest," and it "identifies an individual that is wanted by Bureau of Detective[s] [(BOD)] or Bureau of Organized Crime [(BOC)] investigative personnel concerning a specific crime, and while an arrest warrant *has not been issued*, there is probable cause for an arrest." (Emphasis added.) Chicago Police Department Special Order No. S04-16, § II.A.1 (eff. Dec. 18, 2018), http://directives.chicagopolice.org/directives/data/ a7a57be2-12b780f4-30412-b787-088f791c8131bbf7.html (last visited July 22, 2019) [https://perma.cc/BGH5-E44M]. The second type is called, "Investigative Alert/No Probable Cause to Arrest," and it "identifies an individual that [BOD] or [BOC] investigative personnel

seek to interview concerning a specific police matter. However, an arrest warrant for that individual has not been issued, and there is no probable cause to arrest that person on the strength of the investigative alert alone." *Id.* § II.A.2.

¶ 32     The special order also directly instructs police officers confronting a person subject to the "No Probable Cause" alert that they not make an arrest unless the person committed another crime. See *id.* § V.A.2.a. By contrast, if a "Probable Cause" alert has been issued, the special order instructs the officers to immediately "place the subject into custody if not already in custody." *Id.* § V.A.1.b. The City of Chicago has affirmatively represented in federal litigation that these are the two types of investigative alert orders. *E.g.*, *Sanders v. Cruz*, No. 08 C 3318, 2010 WL 3004636, at *3 (N.D. Ill. July 29, 2010).

¶ 33     This court has described either the issuance of investigative alerts or officers' knowledge that an alert had or had not been issued in the factual summaries of a heap of cases (see appendix, *infra* ¶ 114). This court has also mentioned investigative alerts as non-dispositive components of other legal arguments in a variety of contexts (see *infra* ¶ 114). And these references represent only published decisions. Many more cases discuss investigative alerts under their former name, "stop orders." *E.g.*, *People v. Cokley*, 347 Ill. App. 3d 292, 298-300 (2004), *vacated*, 211 Ill. 2d 589 (2004) (supervisory order directing appellate court to retain jurisdiction in event that outcome of suppression hearing on remand did not result in new trial). Thus, while our research has uncovered no other jurisdiction in Illinois that uses a system like investigative alerts, the practice of issuing investigative alerts and acting on them has had a recurring appearance in this Appellate District.

¶ 34     Prolific though it may be, the practice of arrests based on investigative alerts has been strongly condemned in this court. *E.g.*, *People v. Hyland*, 2012 IL App (1st) 110966, ¶¶ 39-52

(Salone, J., specially concurring, joined by Neville, J.). Justice Salone's concurrence in *Hyland* focused heavily on the lack of judicial review, which allows police "unbridled power to take into custody persons without the benefit of an arrest warrant." *Id.* ¶ 46. While Justice Salone opined on the propriety of investigative alerts, critical to the decision in *Hyland* was the court's conclusion that the officers did *not* have probable cause to arrest the defendant. *Id.* ¶ 39. So, while Justice Salone raised many important prudential concerns, *Hyland* itself did not pose the constitutional question we confront here.

¶ 35                    *Investigative Alerts and the United States Constitution*

¶ 36    Unlike *Hyland*, we are confronted with the only circumstance in which the constitutional question appears at all, which is where an officer had become aware of facts amounting to probable cause. If we were convinced that at the time of Bass's arrest no probable cause existed in the first place, then we could so hold and go no further because our conclusion would be the same regardless of whether the police issued an investigative alert or a neutral magistrate issued a warrant. See, *e.g.*, *People v. Manzo*, 2018 IL 122761, ¶ 61 (reversing trial court's determination that probable cause existed to issue warrant). But, we are not asked to decide whether there was probable cause for Bass's arrest; we are asked to decide *who* has the constitutional authority to make that determination. That question only arises when there is probable cause to arrest either way.

¶ 37    Under the United States Constitution, the existence of probable cause also answers the question. It is well-settled that the fourth amendment allows for warrantless arrests outside the home as long as the police have probable cause to arrest the suspect. See *United States v. Watson*, 423 U.S. 411, 417 (1976); *People v. Tisler*, 103 Ill. 2d 226, 237 (1984). Because Bass

has conceded that the facts in the investigative alert amounted to probable cause, his warrantless arrest did not violate the fourth amendment to the United States Constitution.

¶ 38                    *Investigative Alerts and the Illinois Constitution*

¶ 39    Our agreement that the existence of probable cause satisfies the United States Constitution does not end the inquiry as to the Illinois Constitution. Bass's original brief cited the Illinois Constitution, but did so without exposition on why the result might differ by applying its unique language and the precedent interpreting it. We requested supplemental briefs from the parties on the Illinois constitutional question and, after reviewing them, agree that the language of the Illinois Constitution and precedent interpreting it supports Bass's argument.

¶ 40    There are several approaches to state constitutional interpretation ranging from true "lockstep," viewing interpretations of the federal constitution as binding, to "primacy" approaches, viewing interpretations of the federal constitution as mere guidance. See *Caballes*, 221 Ill. 2d at 307-09. Our supreme court has called it an "overstatement" to say that Illinois employs a true "lockstep" approach to interpretation of provisions of our constitution that have federal constitutional analogs. *Id.* at 309. Instead, as both parties acknowledge in their supplemental briefs, Illinois follows a "limited lockstep" approach, which assumes the primacy of federal constitutional interpretation but looks to the Illinois Constitution for any gap-filling potential it may have. *Id.*

¶ 41    The State argues that the limited lockstep approach "demands *** strict conformance to the United States Supreme Court and Constitution." Our supreme court has not taken an all-or-nothing view. Instead, when determining whether to depart from limited lockstep, Illinois courts look to the language of our constitution or the debates and committee reports from the constitutional convention. *Id.* at 310 (citing *Tisler*, 103 Ill. 2d at 245). For further guidance, we

can look to our own state traditions and preexisting law. *Id.* at 310-11 (discussing *People v. Washington*, 171 Ill. 2d 475 (1996), and *People v. Brocamp*, 307 Ill. 448 (1923)).

¶ 42    A substantial body of criticism has been leveled against Illinois's use of the "limited lockstep" approach to interpreting our constitution. *E.g.*, *Caballes*, 221 Ill. 2d at 307 (citing Thomas B. McAffee, *The Illinois Bill of Rights and Our Independent Legal Tradition*, 12 S. Ill. U. L.J. 1, 87 (1987)); see also *e.g.*, Hon. John Christopher Anderson, *Can State Constitutional Development Make a Difference in Illinois?*, 39 N. Ill. L. Rev. 48, 59-60 (2018) (noting that *Caballes* left open possibility that Illinois courts could depart from lockstep with the federal constitution if they find the federal interpretation badly reasoned); Timothy P. O'Neill, *Escape From Freedom: Why "Limited Lockstep" Betrays Our System of Federalism*, 48 J. Marshall L. Rev. 325 (2014)). Much of Bass's argument focuses on these kinds of policy judgments about the value of limited lockstep. For example, he argues that Illinois "does not blindly follow federal courts when the legitimate interests of our citizens are at risk" and our courts have shown "willing[ness] to exercise judicial independence in interpreting the Illinois Constitution when the rights of Illinois's citizens are infringed."

¶ 43    While calls to reconsider an approach to Illinois constitutional interpretation that tracks so closely with the federal constitution have much to recommend them, we need not (and do not) take a side in those debates. For the purposes of Bass's case, we find, with regard to the necessity of a warrant issued by a neutral magistrate, historical precedent concludes that article I, section 6 provides greater protections than the fourth amendment. Indeed, arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution.

¶ 44                            *Constitutional Text*

¶ 45     Following the analytical framework in *Caballes*, the text of the Illinois Constitution sets the beginning of the inquiry. Bass argues that the language in the 1970 constitution indicates the General Assembly's and (by extension) the people's intent to depart from the limited lockstep approach to interpreting our search and seizure clause. He's right, but he focuses on the wrong text. But, we have the obligation to properly apply the law even where the parties have not. See *Dan Ryan Builders, Inc. v. Crystal Ridge Development, Inc.*, 783 F.3d 976, 980 (4th Cir. 2015) ("A party's failure to identify the applicable legal rule certainly does not diminish a court's responsibility to apply that rule. The judiciary would struggle to maintain the rule of law were it limited to the parties' competing assertions about what the law requires. For this reason, it is well established that '[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law' " (quoting *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991))); see also *People v. Knapp*, 2019 IL App (2d) 160162, ¶¶ 45, 57.

¶ 46     We do not rely on these cases, as the partial dissent suggests, to justify our review of the purportedly "unargued and unbriefed issues." As we have said, Bass raised the constitutionality of investigative alerts in his original briefs. We point to these cases only as examples of situations where courts of review do not rely on a party's precise legal theory to address the question presented where the party's analysis goes astray. Ultimately, Bass points us in the right direction and arrives at the right destination.

¶ 47     Bass emphasizes the language in our constitution that protects our citizens from "invasions of privacy or interceptions of communications by eavesdropping devices or other means." Ill. Const. 1970, art. I, § 6. Bass takes this language to mean the General Assembly that

proposed this amendment must have thought the Illinois Constitution went beyond the federal constitution because this language does not appear in the fourth amendment at all. Compare U.S. Const., amend. IV.

¶ 48    In a literal sense, this is right, because we afford (and have always afforded) independent meaning to portions of our constitution that have no federal analog. *Hope Clinic for Women, Ltd. V. Flores*, 2013 IL 112673, ¶ 42 ("The privacy clause is unique to the Illinois Constitution, there being no cognate provision in the federal constitution. Accordingly, we interpret the provision without reference to the federal counterpart."). Even though the federal constitution has no provision expressly protecting privacy or protecting against the interception of communications by eavesdropping (see *id.*), it does have a provision protecting against unreasonable searches and seizures and requiring a warrant. It is the analogous text in our constitution related to those provisions that we must analyze to determine if a basis exists for a different interpretation under our law.

¶ 49    In its first form, our constitution's search and seizure clause read:

> "That the people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and that general warrants whereby an officer may be commanded to search suspected places without evidence of the fact committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty, and ought not to be granted." Ill. Const. 1818, art. VIII, § 7.

That same language persisted in the next ratified constitution. Ill. Const. 1848, art. XIII, § 7. Under these versions, the only mention of warrants involved a condemnation of the issuance of a general warrant. Not until 1870 did the language in the search and seizure clause of our

constitution appear substantially similar to its current counterpart. Compare Ill. Const. 1870, art. II, § 6, and Ill. Const. 1970, art. I, § 6. That language differs from the fourth amendment in one critical respect relevant here:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no [w]arrants shall issue, but upon probable cause, supported by *[o]ath or affirmation*, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added.) U.S. Const., amend. IV.

Compare with:

> "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue without probable cause, supported by *affidavit*, particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added.) Ill. Const. 1870, art. II, § 6.

¶ 50 We can tell from the debates during the 1870 Constitutional Convention that the delegates intentionally included the word "affidavit." The first proposed version of the search and seizure clause at the 1870 convention included the words "oath or affirmation" instead of "affidavit," tracking the text of the fourth amendment almost verbatim. Journal of the Constitutional Convention of the State of Illinois 664-65 (Apr. 23, 1870), https://babel.hathitrust.org/cgi/pt?id=hvd.li2qkb;view=1up;seq=678 (last visited July 22, 2019) [https://perma.cc/9US2-BBZP]. During debate, one of the delegates proposed striking the phrase "oath or affirmation" and replacing it with the word "affidavit." *Id.* at 772. The convention

adopted that amendment (*id.* at 773), and included it in the language of the ratified constitution. Ill. Const. 1870, art. II, § 6.

¶ 51                    *Early Interpretations of the 1870 Constitution*

¶ 52    Close in time to the addition of this language, our supreme court held that requiring an "affidavit" as opposed to mere "oath or affirmation" was "a step beyond the constitution of the United States." *Lippman v. People*, 175 Ill. 101, 112 (1898). The court found that

> "[w]herever a statute requires probable cause, supported by oath or affirmation, the complaint must set up facts and cannot rest on mere belief ***. *** [T]he law, in requiring a showing of probable cause, supported by affidavit, intends that the facts shall be stated which shall satisfy the *magistrate* that suspicion is well founded. The mere expression of opinion, under oath, is no ground for the warrant, except as the facts justify it." (Emphasis added. ) *Id.* at 113.

The purposes of going "a step beyond" the federal constitution involves limits on "the abuse of executive authority" and "to substitute judicial discretion for arbitrary power, so that the security of the citizen and his [or her] property shall not be at the mercy of individuals or officers." *Id.* at 112.

¶ 53    While *Lippman* dealt with a search warrant (*id.* at 104), our supreme court later found that "[t]he language of section 6 of article 2 of our constitution provides exactly the same protection whether the warrant be for the search of a house and the seizure of property or for the search or seizure of a person." *People v. Elias*, 316 Ill. 376, 382 (1925), *overruled on other grounds by People v. Williams*, 27 Ill. 2d 542, 544 (1963) (allowing warrant affidavits based on credible hearsay). The court in *Elias* reaffirmed our supreme court's commitment to vesting the probable cause determination in a neutral magistrate, not an executive branch officer:

"The magistrate must exercise his [or her] own judgment and not act on the judgment of the official accuser. A warrant issued upon a conclusion of the accuser, without any facts stated in the application upon which a judicial officer to whom it is addressed may form his [or her] own conclusion, does not show 'probable cause supported by affidavit,' within the meaning of the [constitutional] guaranty." *Elias*, 316 Ill. at 381 (quoting *State ex rel. Samlin v. District Court of Sixteenth Judicial District*, 198 P. 362, 365 (Mont. 1922)).

¶ 54     Our supreme court has similarly concluded that a citizen cannot be arrested "on the unsworn complaint or information of the [s]tate's attorney any more than on the unsworn complaint of a private citizen or on no complaint at all." *People v. Clark*, 280 Ill. 160, 167 (1917). Even though a state's attorney, like the police officer in Bass's case, is sworn to uphold the laws and constitution of the United States and Illinois, this oath cannot substitute for a sworn affidavit presented to a neutral magistrate. *Id.*

¶ 55     Other decisions in the decades following the ratification of the 1870 constitution confirm the primacy of the role of the neutral magistrate in the probable cause determination. In *People v. McGurn*, the defendant rode in a taxi that was stopped on a Chicago street. 341 Ill. 632, 634 (1930). Two police officers, riding on a streetcar, saw the defendant. *Id.* They did not see the defendant committing a crime and knew only that they had a "standing order" from a superior officer to arrest the defendant. *Id.* at 634-35. The officers got into the taxi, found a gun on the defendant, and arrested him. *Id.*

¶ 56     The court, again reaffirming the necessity of a determination of probable cause by a neutral magistrate, found that "under the constitution of this [s]tate no municipality has authority to clothe any officer with the autocratic power to order the summary arrest and incarceration of

any citizen *without warrant or process of law* and thus render the liberty of every one of its citizenry subject to the arbitrary whim of such officer." (Emphasis added.) *Id.* at 638. Even while acknowledging the statutory authority to arrest without a warrant, the court emphasized that an officer "has no authority, upon bare suspicion, or upon mere information derived from others, to arrest a citizen and search his person in order to ascertain whether or not he was [violating the law]." *Id.* at 642.

¶ 57    The common thread through all of these amendment-era cases is that the mere word of an executive branch official fails, on its own, as a substantiate for a finding of probable cause. The interposition of a neutral magistrate became the paradigm of investigative propriety. Notably, had Illinois borrowed the language of the fourth amendment verbatim, the foundations of these cases would be severely eroded. The fourth amendment allows a finding of probable cause on "oath *or* affirmation." So while the "judgment of the official accuser" would not be enough under the Illinois Constitution (*Elias*, 316 Ill. at 381), mere affirmation by an executive branch official would be enough under the fourth amendment. This is yet further evidence that the drafters of our constitution made a deliberate choice to use the word "affidavit" in order to provide greater protections in Illinois than the protections enjoyed under the fourth amendment.

¶ 58    We acknowledge the long-standing common-law tradition allowing warrantless arrests for felonies where a citizen was "reasonably suspected of being [a] felon[ ]." *McGurn*, 341 Ill. at 636. That common-law rule has been part of the law in Illinois for many decades. *Id.* (citing Illinois statute allowing for warrantless arrest where "a criminal offense has, in fact, been committed and [the officer] has reasonable ground for believing that the person to be arrested has committed it" (citing Ill. Rev. Stat. 1929, ch. 38, ¶ 657)). A similar statutory provision exists

today. 725 ILCS 5/107-2(1)(c) (West 2016) (allowing for warrantless arrest where officer "has reasonable grounds to believe that the person is committing or has committed an offense").

¶ 59　But, as we have described, *McGurn* itself placed limits on this common-law rule that are relevant to the constitutionality of investigative alerts. The constitution of this state does not "clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law." *McGurn*, 341 Ill. at 638. To hold otherwise would allow " 'for officers of the law, urged in some cases by popular clamor, in others by the advice of persons in a position to exert influence, and yet in others by an exaggerated notion of their power and the pride in exploiting it, to disregard the law on the assumption that the end sought to be accomplished will justify the means.' " *Id.* (quoting *Youman v. Commonwealth*, 224 S.W. 860, 863 (Ky. 1920)). The mere word of another officer, based on the mere word of another citizen, does not meet the Illinois constitutional threshold for effectuating a lawful arrest.

¶ 60　We pause to emphasize that applying the limitation set out in *McGurn* does not impede officers from relying on the collective knowledge of their fellows. The State argues that arresting officers can rely on information provided by nonarresting officers as long as the facts known to the nonarresting officers suffice to establish probable cause. See *People v. McGee*, 2015 IL App (1st) 130367, ¶ 49. That is the rule and has been at least since the United States Supreme Court's decision in *Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting the aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."). See also *United States v. Hensley*, 469 U.S. 221, 232 (1985) ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer

or bulletin justifies a stop to check identification [citation], to pose questions to the person, or to detain the person briefly while attempting to obtain further information.").

¶ 61 Significantly, the principles in *Whiteley* and *Hensley* apply in a world without investigative alerts. In *Whiteley*, officers relied on information from their colleagues that an *arrest warrant* had been issued after assessment of the facts by a neutral magistrate. There, probable cause had been asserted and properly tested before a judge, so unless the nonarresting officers turned out to be lying, the arrest would still be valid. See *Whiteley*, 401 U.S. at 568. *Hensley* did not involve arrests and permitted *Terry* stops (*Terry v. Ohio*, 392 U.S. 1 (1968)) to be made based on the issuance of a bulletin by another police department. *Hensley*, 469 U.S. at 233. Even without an investigative alert, an officer may still conduct *Terry* stops when he or she has information from another officer that a reasonable suspicion exists that a crime has been committed. In sum, our conclusion that investigative alerts are unconstitutional does not deprive police of their ability to rely on the collective knowledge of their colleagues.

¶ 62 As we have set out, the text of the Illinois Constitution leaves beyond dispute that a finding of probable cause must be based, not only on a minimum threshold of sufficient facts, but sufficient facts presented in proper form (a sworn affidavit) to the appropriate person (a neutral magistrate). The Illinois Supreme Court's early interpretations of our warrant clause shows a strong presumption against executive branch officers making their own probable cause determinations without swearing to facts before a magistrate. Taking together the text of our constitution and its historical interpretation by our supreme court, we conclude that the Illinois Constitution requires, in the ordinary case, a warrant to issue before an arrest can be made. Arrests based on investigative alerts violate that rule.

¶ 63                                    *The 1970 Constitution*

¶ 64 The 1970 Constitution bolsters our conclusion. *Caballes* found it appropriate to continue following the United States Constitution in limited lockstep, in part, because the drafters of the 1970 Constitution were aware of that interpretive framework at the time of the ratification debates and took no affirmative steps to amend the constitution to get around it. *Caballes*, 221 Ill. 2d at 292-94 (discussing *People v. Rolfingsmeyer*, 101 Ill. 2d 137, 142 (1984)). A no less powerful consequence of that logic means that we must presume those same drafters knew of historical instances in which the Illinois Supreme Court *departed* from the limited lockstep approach. By not altering the language, we must presume they accepted those interpretations of the constitution as well.

¶ 65 This canon of construction examines the ratification debates surrounding article I, section 6, revealing little attention having been paid to its pre-existing language. Indeed, the highlight of the 1970 Constitutional Convention, at least as far as section 6, was the new language expanding protections for privacy and against the unreasonable interception of communications. From the historical record, the drafters meant to leave substantial portions of section 6, and by extension any previous interpretations of its language, unchanged: "There is nothing new or no new concepts that the Bill of Rights Committee intended to provide insofar only as the search and seizure section—or the search and seizure concept—is concerned ***." 3 Record of Proceedings, Sixth Illinois Constitution Convention 1524 (statements of Delegate Dvorak), http://www.idaillinois.org/cdm/ref/collection/isl2/id/3982 (last visited July 22, 2019) [https://perma.cc/5PNE-ERAD]. Most of the discussion, and debate, focused on two new concepts introduced into section 6 in the 1970 constitution—protections against eavesdropping and the privacy clause. See generally *id.* at 1524-45. We must presume, based on the drafters'

relative silence, that they acquiesced in the historical application of the limited lockstep doctrine, both where our supreme court has adhered to it *and* departed from it.

¶ 66                                    *Traditional Law Enforcement Tools*

¶ 67    Our conclusion about investigative alerts under the Illinois Constitution does not take away any of the traditional tools available to law enforcement. Invalidating the investigative alert procedure does not alter any of the already-existing constitutional doctrines allowing them to work around the warrant requirement. For example, officers can already act without a warrant when they are confronted with "the need to render emergency assistance, the 'hot pursuit of a fleeing suspect,' and the need to prevent the imminent destruction of evidence." *People v. Harrison*, 2016 IL App (5th) 150048, ¶ 17 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). These exceptions already apply to situations that require a warrant.

¶ 68    We cannot stress enough that our holding rests on the structure of the investigative alert system. An investigative alert is not a fast-acting response to an evolving scenario in the field. The system parallels the warrant system, in both the time it takes and the deliberation required, and in that way the procedure allows police to obtain warrant-like documents without the one safeguard that the framers of the Illinois Constitution found most important—an affidavit presented to a neutral magistrate. The oddity of the investigative alert system is that it appears to be no less burdensome for police than the procedure for actually obtaining a warrant. To get an investigative alert issued, an officer "must submit to a supervisor a report explaining what investigative steps have been taken in the case and the basis of the officer's belief that probable cause exists." *Craig v. City of Chicago*, No. 08 C 2275, 2011 WL 1196803, at *3 (N.D. Ill. Mar. 25, 2011). It can take up to a full day for a supervisor to approve the request for an investigative alert. *Hale v. City of Chicago*, No. 10 C 0547, 2013 WL 2338125, at *4 (N.D. Ill. May 22, 2013).

As Justice Salone noted in *Hyland*, "[i]f there is time to get a supervisor's approval for the investigative alert, as the special order requires, there is time to seek an arrest warrant from a member of the judiciary." *Hyland*, 2012 IL App (1st) 110966, ¶ 51 (Salone, J. specially concurring, joined by Neville, J.).

¶ 69    Another oddity of the investigative alert system related to the suppression remedy is that, compared to the warrant system, the costs are much higher in terms of suppression of evidence that is discovered as a result of an arrest later determined to be lacking probable cause. Traditionally, where an officer does not have probable cause to arrest, the evidence the officer discovers as a result of that arrest must be suppressed absent a warrant or exigent circumstance. See *In re D.W.*, 341 Ill. App. 3d 517, 529-30 (2003). But, when the officer acts under the cover of a warrant, the evidence the officer discovers may still be admitted even if a court eventually invalidates the warrant for lack of probable cause. *People v. Manzo*, 2018 IL 122761, ¶ 63 ("exclusion of evidence was not required where a police officer acted in objectively reasonable reliance on a facially valid warrant *** later found invalid based upon a lack of probable cause" (citing *United States v. Leon*, 468 U.S. 897 (1984))).

¶ 70    So when an officer acts on the department's own determination that probable cause exists, he or she risks suppression of the evidence uncovered, but when an officer acts with the imprimatur of a neutral magistrate, the evidence the officer uncovers will still be admitted even if the magistrate turns out to have been wrong. Indeed, in this additional way, investigative alerts fail to improve the administration of criminal justice. They increase the risk of the " 'substantial social cost' " incurred by suppression of competent evidence. *Id.* ¶ 64 (quoting *People v. LeFlore*, 2015 IL 116799, ¶ 23).

¶ 71    These policy considerations augment our conclusion that the Illinois Constitution's search and seizure provision pointedly prevents overreaching by officers of the executive branch. See *Caballes*, 221 Ill. 2d at 310-11 (noting that we look to our State's "traditions and values" in determining whether to depart from lockstep interpretation of federal constitution). The officers here undoubtedly acted consistently with the established policy at the time, but that policy allowed them to subjectively determine the sufficiency of their own probable cause without the protection of neutral magistrate. We find that our constitution goes "a step beyond" the United States Constitution and requires, in ordinary cases like Bass's, that a warrant issue before a valid arrest can be made. We hold an arrest unconstitutional when effectuated on the basis of an investigative alert issued by the Chicago Police Department.

¶ 72                    *Unlawful Extension of the Traffic Stop*

¶ 73    For the sake of completeness, we also address the legality of the traffic stop, which we find to have been unconstitutionally extended. A traffic stop, like an arrest, is a seizure that implicates the fourth amendment's prohibition against unreasonable searches and seizures. U.S. Const., amend. IV; see also *People v. Jones*, 215 Ill. 2d 261, 268 (2005). As we have discussed, the default requirement for effectuating a reasonable seizure is a warrant supported by probable cause. *Jones*, 215 Ill. 2d at 269 (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). But a lesser standard applies to brief investigatory detentions—colloquially know as *Terry* stops— where a police officer need only have reasonable suspicion that person has committed, or is about to commit, a crime. *People v. Duran*, 2016 IL App (1st) 152678, ¶ 13 (citing *Terry*, 392 U.S. at 21-22). We analyze a traffic stop applying the same standards we would to a *Terry* stop. *Jones*, 215 Ill. 2d at 270.

¶ 74   A seizure, lawful at its inception, may nevertheless violate the fourth amendment if it is "prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The United States Supreme Court has recently applied this principle in *Rodriguez v. United* States, 575 U.S. ___, 135 S. Ct. 1609 (2015). There, the court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Id.* at ___, 135 S. Ct. at 1614. Ordinary inquires related to traffic stops include checking the driver's license, doing a warrant check on the driver, or asking for registration and proof of insurance. *Id.* at ___, 135 S. Ct. at 1615. Officers also may attend to safety concerns as part of the stop's "mission." *Id.* at ___, 135 S. Ct. at 1616. Authority for the stop ends when tasks related to the stop's purpose are, or reasonably should have been, completed. *Id.* at ___, 135 S. Ct. at 1614.

¶ 75   We are not concerned solely with the duration of the stop or the order of events. The Court in *Rodriguez* explained that officers cannot act outside the scope of the stop's mission just because they act quickly. *Id.* at ___, 135 S. Ct. at 1616 (rejecting argument that officers can get "bonus time" by "completing all traffic-related tasks expeditiously"). The Court also explained that the question is not "whether the [unrelated act] occurs before or after the officer issues a ticket." *Id.* at ___, 135 S. Ct. at 1616. Put in terms of Bass's case, the officers could not buy time to run a name check on Bass just because they finished with the driver more quickly. They also could not run a name check on Bass just because they had not yet finished with the driver. Bass's name check, whenever it occurred, added time to the stop, so we must answer one question: Did the name check on Bass exceed the scope of the traffic stop's mission?

¶ 76   The State's brief makes only one argument, namely, that the running Bass's name check was related to the mission of the stop due to officer safety. Yet, at the same time, the State points

out the officers had already ordered all of the passengers out of the car, including Bass. Officers are allowed to do this for safety reasons. See *Maryland v. Wilson*, 519 U.S. 408, 414 (1997). But, we see no safety justification, and the State has offered none, for running name checks on the passengers when they are already in the control of the officers.

¶ 77    The State's primary argument asserts that the officers did not extend the stop because "the name checks were all done at the same time, prior to the officer issuing the driver his verbal warning." As we have said, the question is not whether the officers did things in the proper order; the question is whether the challenged action was outside the scope of the stop's mission. Were it otherwise, officers could conduct tasks unrelated to the mission of the traffic stop as long as they do so before they issue a ticket. *Rodriguez* does not allow that.

¶ 78    Even if we were concerned with the temporal order of the officer's actions, we would reject the State's argument. At oral argument, the State conceded that it had the burden to show that the officers' conduct was lawful because Bass made a *prima facie* case that the officers' check of the passengers' identifications was unrelated to the mission of the stop. The record does not reveal when Bass's name check was run in relation to the name checks of the other passengers, the LEADS check on the driver, and the completion of the TSS card. The State's failure to clarify the timeline of the stop and thereby meet its burden leads us to conclude that the motion to suppress should have been granted.

¶ 79                                    C. Remedy

¶ 80    The traditional remedy for an unconstitutional arrest is to suppress the fruit of that arrest, including postarrest statements. *People v. Jennings*, 296 Ill. App. 3d 761, 763 (1998). The only exception is where a statement is " 'sufficiently an act of free will' " such that " 'the primary taint of the unlawful invasion' " is purged. *Id.* at 763-64 (quoting *People v. White*, 117 Ill. 2d

194, 222 (1987)). Here, the State has not argued that Bass's postarrest statements should not be suppressed. The State only argues that failure to suppress the statement at Bass's first trial was harmless. See *Arizona v. Fulminante*, 499 U.S. 279, 307 (1991) (admission of evidence obtained in violation of fourth amendment subject to harmless error analysis); see also *People v. Mitchell*, 152 Ill. 2d 274, 328 (1992).

¶ 81    For a constitutional error to prove harmless, it must appear beyond a reasonable doubt that the verdict would have been the same absent the error. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). On this issue, the State has the burden of proof. *Id.* Three approaches have been used for determining whether an error is harmless beyond a reasonable doubt: (1) focusing on the error to determine whether it may have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) considering whether the evidence is cumulative or duplicates properly admitted evidence. *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981).

¶ 82    One cannot seriously dispute that the error contributed to Bass's conviction and that the unlawfully admitted evidence was not cumulative to the properly admitted evidence. The trial court explicitly referenced Bass's statement during its ruling, describing the statement as "telling" and noting that Bass "took advantage of the situation" in a way that was "devious" and "manipulative" to "get back at [his] own girlfriend." Under these circumstances, we conclude that the error in admitting Bass's statements may well have contributed to his conviction. And because the error may have contributed to the conviction and Bass's statement to the police was not merely cumulative to the testimony of T.P. and Dunkin, the error in admitting Bass's statement was not harmless.

¶ 83    The remedy for reversible error is a new trial, but because Bass alleges that the evidence was insufficient to sustain his conviction, we must first consider whether a new trial poses double jeopardy concerns. See *People v. Hernandez*, 2017 IL App (1st) 150575, ¶¶ 134-36.

¶ 84    The double jeopardy clause, found in both the United States Constitution as well as the Illinois Constitution (U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10), prohibits retrial "for the purpose of affording the prosecution another opportunity to supply evidence which it failed to present in the first proceeding" but does not "preclude retrial where a conviction has been set aside because of an error in the proceedings leading to the conviction" (*People v. Lopez*, 229 Ill. 2d 322, 367 (2008)). Therefore, to determine whether a new trial poses double jeopardy concerns, we must examine the sufficiency of the evidence at the initial trial—including that which was improperly admitted. *Id.*; see also *Hernandez*, 2017 IL App (1st) 150575, ¶ 136. As we have set out (*supra* ¶¶ 19-22), the evidence was sufficient to convict Bass and so there is no double jeopardy bar to retrying him.

¶ 85    As we alluded to before, suppression of evidence exacts a "substantial social cost[ ]." (Internal quotation marks omitted.) *Manzo*, 2018 IL 122761, ¶ 64. In no way should our conclusion about the unlawfulness of Bass's arrest diminish the seriousness of Bass's offense or the harm done to the victim. But the Illinois Constitution, like the fourth amendment, must protect the guilty and innocent just the same. See *Mapp v. Ohio*, 367 U.S. 643, 659 (1961) ("The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence."). It is with this understanding that we remand for a new trial.

¶ 86                    D. Responses to Partial Dissent

¶ 87    We reject the assertion that we "decide[d] this case based on a constitutional issue of first impression [we] *sua sponte* raised postargument." *Infra* ¶ 99. Bass's original briefing raised the question of the constitutionality of investigative alerts. Bass framed the issue this way: "Whether the trial court erred in denying Bass's motion to quash arrest and suppress evidence where the police *** used an investigative alert as an end-run around obtaining an arrest warrant in violation of the fourth amendment's prohibitions on unreasonable searches and seizures." In the body of his argument he highlighted that "[b]oth the United States and Illinois Constitutions provide for the use of warrants, issued on probable cause and supported by affidavit." He cited both constitutions in support of that proposition.

¶ 88    We have not " 'sall[ied] forth *** looking for wrongs to right.' " *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of rehearing *en banc*). Placed in its proper context, this quotation does not support the partial dissent's point. Judge Arnold, the author of the sentiment, was concurring in the denial of the Eighth Circuit's decision to hear a case *en banc* (as a full court). The United States Government, through the Solicitor General's office, had declined to seek rehearing, to the ire of the dissenters. *Samuels*, 808 F.2d at 1302 (Fagg, J., dissenting from denial of rehearing *en banc*, joined by Ross, Gibson, and Bowman, JJ.) ("The Justice Department's failure to act should never paralyze this court."). In other words, when Judge Arnold spoke of "sally[ing] forth," he meant courts should refrain from making what amount to litigation decisions on behalf of parties; he did not suggest that appellate courts should refrain from requesting more fully developed argument on an issue that is already presented.

¶ 89    And we have not made any of those litigation decisions. Bass *did* elect to advance the argument that investigative alerts are unconstitutional. He also addressed the Illinois

constitutional question in supplemental briefing. In two rounds of briefing the State had an opportunity to respond to Bass's arguments. Depriving parties of any opportunity to raise an argument (which we have not done) differs entirely from disagreeing with the parties' analysis of an issue that is presented. In any event, a petition for rehearing provides the losing party with an opportunity to raise misstatements of facts and mistakes of law. *People v. Rossi*, 387 Ill. App. 3d 1054, 1060 (2009) ("[t]he purpose of a petition for rehearing is to provide litigants with the opportunity to direct the court's attention to errors in the court's previous application of existing law").

¶ 90    Properly understood, our reliance on an analysis that departs from the precise argument that Bass made in his supplemental brief is not unusual. Appellate courts regularly and must do so. See *Miller v. Civil Constructors, Inc.*, 272 Ill. App. 3d 263, 265 (1995) (addressing issue raised in plaintiff's brief even though "plaintiff's counsel has failed to provide much in the way of legal authority or even persuasive legal analysis"). If we had to follow parties' arguments to the letter, we would be constrained to issue decisions that got the law wrong because the only analysis presented by the parties was wrong. See *Dan Ryan Builders*, 783 F.3d 976 at 980. This would be an abdication, not vindication, of our judicial duties.

¶ 91    Two further examples provide guidance. We have the authority to reject concessions when we believe a party has gotten the law wrong. See *People v. Sykes*, 2012 IL App (4th) 100769, ¶¶ 21-22 (rejecting State's concession of error where court believed trial court to be incorrect); *In re T.A.*, 359 Ill. App. 3d 953, 957 (2005) (rejecting parties' concession that case from another district controlled where court disagreed with outcome of other case); see also *People v. Hollins*, 2012 IL 112754, ¶ 70 (Burke J., dissenting, joined by Freeman, J.) (similar). We also see courts address the merits even where the parties have not complied with Illinois

Supreme Court Rule 341 (eff. May 25, 2018). See *People v. Grenko*, 356 Ill. App. 3d 532, 534-35 (2005) (addressing merits on appeal even though the defendant's brief failed "to address the merits of the [trial court's] decision"); *People v. Patrick*, 298 Ill. App. 3d 16, 31 (1998) (addressing defendant's argument about sufficiency of the evidence even though the point was "raised but not argued" in violation of Rule 341).

¶ 92    The partial dissent suggests that a factual reason bars our taking up the issue of investigative alerts: "Had the issue been raised at the trial level, a factual record necessary to address these issues could have been developed." But, the partial dissent does not indicate what additional facts we would need. The record shows that the police issued an investigative alert after talking to the victim. The record shows that the investigative alert was the *sole* basis for Bass's arrest. And critically, the record shows that the police did not arrest Bass until weeks after the investigative alert issued, an ample amount of time within which officers could have gotten a warrant. We are at a loss to understand what other facts would aid our consideration of the propriety of investigative alerts as a constitutional matter, especially given that our ultimate determination as to whether suppression of evidence is warranted mandates *de novo* review. *Harris*, 228 Ill. 2d at 230.

¶ 93    We have also not engaged in any of our own "factfinding" (*infra* ¶ 109) to reach our decision. The information that investigative alerts are not issued instantaneously is apparent from judicial decisions. *E.g.*, *Hale*, 2013 WL 2338125, at *4 (investigative alert approved one day after submitting to supervisor). We also did not make a finding of fact to determine that investigative alerts are unique to Cook County; every single Illinois decision referencing investigative alerts comes from the First District, which only covers Cook County. What the partial dissent describes as "factfinding" is no more than legal research.

¶ 94    As part of that research, we have cited 22 cases mentioning or discussing investigative alerts. But, in addition to the 22 cases mentioned in the appendix, a Westlaw search shows that investigative alerts have been mentioned or discussed in 97 Rule 23 orders, 81 of those after the partial dissent's cutoff date of December 20, 2012. And that's to say nothing of the additional 36 federal cases in the Seventh Circuit and Illinois District Courts (27 after December 20, 2012). And, as we set out, investigative alerts were formerly known as "stop orders." At least a dozen cases in Illinois mention or discuss investigative alerts under their former name (and that is only on the first page of Westlaw results). *E.g.*, *People v. Lewis*, 92 Ill. App. 2d 463, 467 (1968). We are comfortable describing the over 155 mentions of investigative alerts in court decisions as a "heap."

¶ 95    Despite their frequent mention, investigative alerts have not been addressed often. We do so now because, as we have underscored throughout this opinion, Bass raised the constitutionality of investigative alerts, pointing to *both* the United States and Illinois Constitutions in his original briefing. We see no impropriety in attempting to correctly answer a question that was presented to us.

¶ 96    Because we remand for a new trial, we need not address Bass's challenge to the fines and fees the trial court imposed.

¶ 97    Reversed and remanded.

¶ 98        **SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING**

¶ 99    The State has filed a timely petition for rehearing raising three primary arguments: (i) we misapplied Illinois's limited lockstep doctrine, (ii) we misread historical case law about the primacy of the magistrate in determining probable cause, and (iii) even if our analysis is correct, the good faith exception to the exclusionary rule should apply. We have not requested a response

from Bass because only minor clarifications of our original opinion address the State's arguments.

¶ 100   The State argues that we should reconsider our decision because it conflicts with Illinois Supreme Court precedent saying that our constitution "must be read in lockstep" with the federal constitution. The State cites *People v. Holmes*, 2017 IL 120407, ¶ 25, where our supreme court said, "we follow decisions of the United States Supreme Court regarding searches and seizures." The State omits the quotation from the immediately preceding paragraph where the court clarifies that Illinois only follows the United States Supreme Court's guidance "unless any of the narrow exceptions to lockstep interpretation apply." *Id.* ¶ 24 (citing *People v. Fitzpatrick*, 2013 IL 113449, ¶ 28). As we noted in our original opinion, our supreme court has expressly said "it is clear that it is an overstatement to describe our approach as being in strict lockstep with the Supreme Court." *Caballes*, 221 Ill. 2d at 309. The State attempts this same overstatement in its petition for rehearing. The language from *Caballes* that the State quotes in its brief comes from our supreme court's *application* of the limited lockstep approach to the circumstances before it, not its explanation of the doctrine. *Id.* at 316-17. Our original opinion follows the analytical pattern set out in *Caballes* to determine whether to depart from lockstep: text, constitutional debates, historical precedent, state traditions, and values. *Supra* ¶ 41.

¶ 101   The State next argues that we have misread the historical precedent that guided us to our conclusion. In particular, the State disagrees with our citation to *McGurn*, 341 Ill. 632. The State argues that the officers in *McGurn* admitted they did not have probable cause and that limits the decision's persuasive value. On closer examination, we agree in part with the State, which has accurately described the facts of *McGurn*. *Id.* at 634 (describing officer's testimony that he had no reasonable grounds to believe defendant had committed either misdemeanor or felony). We

conclude that *McGurn*'s facts make it a poor vehicle for a literal comparison with Bass's case. But, that is where our agreement ends. *McGurn*, as just one example, gives voice to the attitudes and values that existed nearer the time of the ratification of the 1870 Constitution—an attitude of skepticism toward executive branch officials making their own determinations about the sufficiency of their cause to arrest someone. *Supra* ¶¶ 52-60.

¶ 102   The State's arguments bring to the fore a comparison we made in our original opinion between investigative alerts and warrants. *Supra* ¶ 68. We made that comparison in practical terms, noting that investigative alerts appear to offer no investigative benefits to officers in terms of efficiency; all they do is allow officers to sidestep a judge. The State's arguments on rehearing show that we should place that comparison in more concrete doctrinal terms.

¶ 103   As our original opinion sets out, our decision rests on the warrant clause of the Illinois Constitution. The State does not dispute, and early postratification precedent confirms, that the framers of our constitution believed the presentation of sworn affidavits to a neutral magistrate to be the constitutional baseline for probable cause to issue a warrant. *Supra* ¶ 53 (citing *Elias*, 316 Ill. at 381). We fail to see how our constitution would zealously protect against the issuance of a warrant without probable cause proven to a neutral magistrate, but would allow the issuance of an alert that has every feature of a warrant *except* the presentation of sworn facts to a neutral magistrate.

¶ 104   We adhere to our discussion of all of the law enforcement tools available to officers even without investigative alerts. *Supra* ¶¶ 60-61, 67. To that discussion we add that our decision that the issuance of an investigative alert is a deliberative process, not a response to actions unfolding in real time or in an emergency. Why would an officer prefer an investigative alert to a warrant? The most likely answer is that the officer worries he or she possesses insufficient facts to

persuade a judge to issue a warrant. Investigative alerts are a deliberate end-run around the principles imbued in our constitution; it is that error we correct and our opinion passes no judgment on other police practices not at issue.

¶ 105    This brings us to the question of remedy. The State urges us to apply the good faith exception to the warrant requirement should we adhere, as we have, to our original opinion. In short, the good faith exception allows the State to introduce evidence obtained in violation of the constitution as long as officers acted with a reasonable belief that their actions comported with settled precedent. See *LeFlore*, 2015 IL 116799, ¶ 27. This argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued are forfeited and shall not be raised *** on petition for rehearing."). In both its original brief and supplemental brief, the State addressed Bass's arguments on the merits. The only mention of a remedial argument was that any error in denying the motion to suppress would have been harmless, an argument addressed in our original opinion. *Supra* ¶¶ 80-82. Indeed, the argument may be affirmatively waived; in footnote 3 in its original brief, the State contested Bass's assertion that the remedy was outright reversal but appeared to agree that the proper remedy would be a new trial if we agreed with Bass on the merits. We decline to apply the good faith exception.

¶ 106    Our colleague would find that the State's good faith argument is not forfeited because "there was no basis for the State to have raised application of the good faith exception in its original briefs." As we wrote in response to the original dissent, Bass raised the constitutionality of investigative alerts in his original opening brief. The State has been on notice since the filing of that brief that there was a possibility that we would invalidate Bass's arrest on that basis. Because this would have been (and is) the first case to so hold, the State was similarly on notice that the good faith exception was an available argument. See *LeFlore*, 2015 IL 116799, ¶ 27

(good faith exception available where officers were relying on settled precedent). The applicability of the good faith exception to Bass's argument did not depend on whether our holding was grounded in the United States or Illinois Constitution and so there is no basis to excuse that forfeiture now.

¶ 107   In all other respects, we adhere to our original opinion.

¶ 108   JUSTICE MASON, concurring in part and dissenting in part:

¶ 109   I agree that Bass's conviction must be reversed and so concur in the ultimate result. I further concur in the conclusion that, even without Bass's incriminating statements, the evidence was sufficient to sustain his conviction. I write specially because I do not agree with the majority's analysis on the issue of whether the traffic stop was unnecessarily prolonged. I respectfully dissent, in part, because the majority decides this case based on a constitutional issue of first impression it raised *sua sponte* postargument. The majority's decision to *reverse* Bass's conviction on this self-styled constitutional issue is neither necessary nor appropriate.

¶ 110   I first address the majority's decision to raise and resolve the broad constitutional issue under the Illinois constitution that is the centerpiece of its analysis. The majority's conduct in raising a constitutional issue *sua sponte* is improper. In *People v. Givens*, 237 Ill. 2d 311 (2010), the appellate court reversed a defendant's conviction based not on any of the issues raised by defendant on appeal but on a different issue the court raised *sua sponte*. In plain language, our supreme court criticized this practice: "Illinois law is well settled that other than for assessing subject matter jurisdiction, 'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment.' " (Emphasis in original.) *Id.* at 323 (quoting *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978)). The court quoted with

approval the following passage from the United States Supreme Court decision in *Greenlaw v. United States*, 554 U.S. 237 (2008):

> " 'In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a *pro se* litigant's rights. [Citation.] But as a general rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them and are responsible for advancing the facts and arguments entitling them to relief." [Citation.] As cogently explained:
>
>> "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do ***." [Citation.] ' " *Givens*, 237 Ill. 2d 323-24 (quoting *Greenlaw*, 554 U.S. at 243-44).

The majority's analysis of investigative alerts under the Illinois constitution makes litigation decisions on behalf of the parties. Specifically, despite its extended disclaimer (*supra* ¶¶ 86-95), the majority has decided that the argument Bass should have made, and which warrants reversal, is one his counsel never elected to advance and one that the State has never had an opportunity to address. See also *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and

research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

¶ 111   The fact that the majority solicited postargument briefs on the issue it determined to raise does not change the impropriety of its decision to act *sua sponte*. Bass, represented by counsel, did not elect to argue the issue of the constitutionality of investigative alerts under the Illinois Constitution and even when invited to, did not advance the rationale the majority now adopts. The majority's analysis—emanating solely from the majority and not from the advocates— remains "unargued and unbriefed."

¶ 112   The majority cites *Dan Ryan Builders, Inc. v. Crystal Ridge Development, Inc.*, 783 F.3d 976, 980 (4th Cir. 2015), nonbinding authority from another federal circuit, and *People v. Knapp*, 2019 IL App (2d) 160162, for the proposition that "we have the obligation to properly apply the law even where the parties have not" (*supra* ¶ 45). Yet both cases *affirmed* the trial court's decision, an important distinction the majority fails to mention. No case—and certainly no binding decision from our supreme court—approves of a court of review reversing a trial court's decision on unargued and unbriefed issues. Indeed, binding authority dictates otherwise. *Givens*, 237 Ill. 2d at 323. Further, because the majority is admittedly addressing a constitutional issue of first impression raised *sua sponte* upon which there is no law, the source of its purported obligation "to properly apply the law" remains unclear.

¶ 113   Apart from its decision to act *sua sponte*, the majority is unnecessarily addressing a constitutional issue, a practice repeatedly criticized by our supreme court. As the court stated recently in *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 34:

> "[T]his court's longstanding rule is that 'cases should be decided on
> nonconstitutional grounds whenever possible, reaching constitutional issues only

as a last resort.' *In re E.H.*, 224 Ill. 2d 172, 178 (2006). Consequently, 'courts ***

must avoid reaching constitutional issues when a case can be decided on other,

nonconstitutional grounds,' and such issues 'should be addressed only if

necessary to decide a case.' *People v. Hampton*, 225 Ill. 2d 238, 244 (2007)."

In frustration, the court has noted that its admonishments "seem to fall not infrequently on deaf ears." *In re E.H.*, 224 Ill. 2d at 172; see also *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009) ("As a general rule, courts in Illinois do not *** render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided."); *People v. Lee*, 214 Ill. 2d 476, 482 (2005) (declining to address alleged facial unconstitutionality of loitering statute because case could be resolved on more limited ground that police lacked probable cause to arrest defendant); Ill. S. Ct. R. 18(c)(4) (eff. Sept. 1, 2006) (requiring any opinion declaring unconstitutional a "statute, ordinance, regulation or other law" to articulate specific grounds for the determination "that the finding of unconstitutionality is necessary to the decision or judgment rendered, and that such decision or judgment cannot rest upon an alternative ground").

¶ 114   Indeed, the majority specifically discusses the much narrower issue that is case-specific: whether the traffic stop was unnecessarily prolonged by investigation into matters unrelated to its mission (*supra* ¶¶ 72-78). Because (i) Bass's conviction should be reversed this narrower ground, *i.e.*, that *this* traffic stop was unduly prolonged (see *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (police seizure that is lawful at its inception may nevertheless violate the fourth amendment if it is "prolonged beyond the time reasonably required to complete [its] mission")),[1]

---

[1]My rationale for reversing on this narrow ground is as follows: The State concedes it had the burden to prove that the traffic stop was not unduly prolonged by virtue of the officers' decision to run "name checks" on the passengers. The record is unclear in what order the name checks were completed and whether they were completed simultaneously with the check of the driver's license. Accordingly, the State did not sustain its burden to show that the seizure extraneous to the purpose of the traffic stop did

and (ii) the majority does not even attempt to articulate why resolution of the broader constitutional issue is necessary or why resolution of this appeal cannot rest on narrower grounds, this decision contravenes our supreme court's directives.

¶ 115 A recap of the procedural history of this appeal illustrates the impropriety of the majority's course of conduct. In his first round of briefs, Bass argued that investigative alerts were unconstitutional under the fourth amendment, an argument the majority recognizes is a nonstarter. *Supra* ¶ 37 ("It is well-settled that the fourth amendment allows for warrantless arrests outside the home as long as the police have probable cause ***."). Under the fourth amendment, if police have probable cause to arrest a defendant, the lack of a warrant is of no moment. *United States v. Watson*, 423 U.S. 411, 417 (1976) (postal inspector's failure to secure warrant for defendant's arrest even though he concededly had time to do so did not invalidate warrantless arrest). And under the fourth amendment, it does not matter how or when the police acquired the information giving rise to probable cause, as long as they possess it prior to the defendant's arrest. *Id.* at 423 ("Congress has plainly decided against conditioning warrantless arrest power on proof of exigent circumstances."). A finding that probable cause existed for defendant's arrest precludes invalidation of that arrest on fourth amendment grounds. Illinois cases have long reached the same result. See *People v. Jones*, 16 Ill. 2d 569, 572-73 (1959) (police had information that defendant had previously supplied informant drugs; informant arranged for defendant to bring drugs to his home; instead, police met defendant and arrested him, finding drugs on his person; denial of defendant's motion to suppress drugs affirmed: an

---

not impermissibly extend its duration, and therefore, the motion to suppress should have been granted. Both this and the majority's analysis of whether running name checks was "unrelated to the mission" of the traffic stop constitute narrow, independent, and legally sufficient bases upon which to reverse. The analysis should, therefore, stop there.

"arrest without a warrant is lawful if a criminal offense has in fact been committed and the arresting officer has reasonable grounds for believing that the person arrested committed it").

¶ 116   Here, because Bass concedes and it is readily apparent that the police did have probable cause to arrest him based on the contents of the investigative alert, which provided the details of his sexual assault of the victim, the only constitutional argument he elected to advance under the fourth amendment fails. Bass advanced no separate or independent argument under the Illinois Constitution, and even if he did, I have no reason to believe that this case would present one of those narrow exceptions to the "limited lockstep" doctrine under which our supreme court has consistently interpreted the Illinois Constitution's search and seizure clause in conformity with the United States Supreme Court's interpretation of the fourth amendment. See *People v. Burns*, 2016 IL 118973, ¶ 19; *People v. Fitzpatrick*, 2013 IL 113449, ¶ 15; *People v. Caballes*, 221 Ill. 2d 282, 316 (2006); *People v. Lampitok*, 207 Ill. 2d 231, 240-41 (2003).

¶ 117   Not content with that result and unwilling to decide the case based on the arguments raised by the parties, the majority, two months after oral argument, entered an order directing the parties to address the constitutionality of investigative alerts under the *Illinois* constitution, thus signaling that the fourth amendment argument of the Office of the State Appellate Defender decided to raise would not carry the day. (I did not sign that order.) Bass nevertheless did not advance the rationale the majority utilizes to reverse his conviction. Instead, Bass argued that the Illinois constitution's language prohibiting "invasions of privacy or interceptions of communications by eavesdropping devices or other means" could be interpreted to prevent the police from maintaining a "database of potentially arrest-worthy individuals" since such conduct "plainly implicates the privacy rights of the citizens of Chicago." Rejecting this argument, the majority comes up with its own analysis. See *supra* ¶ 45 ("[Bass is] right, but he focuses on the

wrong text."). We will not find in the parties' supplemental briefs (or in any reported decision for that matter) a discussion of the difference between the fourth amendment's requirement that warrants be issued based on "oath or affirmation" versus the Illinois constitution's inclusion of the word "affidavit." Nor will we find any discussion of cases dating back to 1898 as the source for the conclusion that the difference in wording was intended to be meaningful and to broaden the protection Illinois citizens enjoy from unlawful searches and seizures. But this is the basis on which the majority resolves this appeal. This is not a proper basis upon which to *reverse* a circuit court's ruling.

¶ 118   The majority rationalizes its decision to raise and resolve its own constitutional issue on the ground that the use of investigative alerts is "prolific" (*supra* ¶ 34) and attaches an appendix citing 22 reported decisions (labeled "a heap" (*supra* ¶ 33)) in which investigative alerts are mentioned but not discussed in any detail. Of those 22 cases, 7 were decided well before any member of this court raised a concern about the use of investigative alerts, leaving 15 cases decided since December 20, 2012 (the date *Hyland* was filed) that refer to investigative alerts in the facts. Add to those the reported decisions actually discussing investigative alerts (*Hyland*, *Starks*, and *Jones*) and the grand total rises to 18. Since December 20, 2012, and through June 30, 2019, this court has decided by published opinion 877 criminal appeals. Accordingly, the 18 cases, including *Hyland*, in which investigative alerts are mentioned comprise slightly over 2% of the criminal appeals decided in the last 6½ years, providing no support for the majority's characterization of the use of investigative alerts as "prolific."

¶ 119   The majority also engages in fact-finding and then declares those "facts" "notabl[e]" (see *supra* ¶ 5). Specifically, the majority finds that "investigative alerts are not issued instantaneously; in many cases, investigative alerts take the same or more time to procure than a

warrant" (*supra* ¶ 5). The majority also observes that it "appears," based on its own research (into facts, not law), that Cook County is the only jurisdiction in Illinois in which investigative alerts are used. The source of these "facts" is undisclosed, and the majority's reliance on them is improper. See *People v. Hughes*, 2015 IL 117242, ¶ 46 ("The dissenting justice below quite aptly pointed out the difficulty of discerning the appellate majority's standard of review; this was because the appellate majority was deciding new issues of fact for the first time on appeal.").

¶ 120   For this additional reason, this case is an inappropriate vehicle to serve as the means to resolve the majority's constitutional issue. Facts regarding the police department's use of investigative alerts have never been developed. *Hyland* recognized as much. 2012 IL App (1st) 110966, ¶ 39 (Salone, J., specially concurring, joined by Neville, J.) ("I *** question the legality of the Chicago police department's *** policy of issuing investigative alerts under any circumstances. In doing so, *I acknowledge this issue has yet to be addressed in any detail*." (Emphasis added.)). No case since *Hyland*, including this one, has developed any facts regarding how often investigative alerts are used and why. Although the majority is willing to assume that investigative alerts are routinely used by police to circumvent the process of obtaining a warrant, there is no apparent reason why, when police have probable cause to arrest an individual (as they did here), the use of an investigative alert gives them any untoward advantage. See 725 ILCS 5/107-2(1)(c) (West 2014) (permitting warrantless arrest when police officer "has reasonable grounds to believe the person *** has committed an offense"); *People v. Buss*, 187 Ill. 2d 144, 204 (1999) (permitting officers to rely on the collective knowledge of other officers for purposes of establishing probable cause). The majority certainly does not articulate any. And I can perceive no principled basis on which to hold that police may arrest an individual without a warrant and without an investigative alert as long as they have probable cause, but if they issue

an investigative alert based on the same facts giving rise to probable cause, they have run afoul of the Illinois Constitution.

¶ 121   Despite the fact that *Hyland* was decided over six years ago, no defendant in any reported case has raised the constitutionality of investigative alerts at the trial level as a basis to quash his arrest and suppress evidence obtained as a result. Had this issue been raised at the trial level, a factual record necessary to address these issues could have been developed. In the absence of any factual record, it is apparent that not only is the majority's decision to address a constitutional issue not raised by Bass prudentially unsound, but its conclusion that this practice is widespread has no factual underpinnings.

¶ 122   Under identical circumstances, courts in this district have refrained from addressing the constitutionality of investigative alerts. See *People v. Brookins*, 2018 IL App (1st) 151431-U, ¶ 62 (finding police had probable cause to arrest defendant; fact that arrest was accomplished after investigative alert issued not discussed); *People v. Starks*, 2014 IL App (1st) 121169, ¶ 77 ("whether the failure of the police to obtain an arrest warrant and instead pursue an individual via an investigative alert poses issues of constitutional dimension must await another case"). We should do the same here.

¶ 123   In sum, I can discern no apparent explanation for the conclusion that *this* case at *this* time presents the ideal opportunity to resolve a constitutional issue of first impression raised *sua sponte* by the majority. For all of the foregoing reasons, I respectfully dissent.

¶ 124   JUSTICE COGHLAN, dissenting upon denial of rehearing:

¶ 125   I must respectfully dissent from the majority's supplemental opinion upon denial of rehearing.

¶ 126 To begin with, I concur in Justice Mason's well-reasoned dissent and adopt it in its entirety, in *haec verba*. Because the dissent recognizes both that historical case law validates arrests based on probable cause under the fourth amendment (*supra* ¶ 115) and rejects application of the narrow exceptions to the limited lockstep doctrine to the facts of this case (*supra* ¶ 116), I embrace those findings with respect to the majority's supplemental opinion (*supra* ¶¶ 98-107).

¶ 127 I choose to separately address the majority's finding that the State forfeited its claim advocating for the application of the good faith exception. The majority invoked forfeiture, arguing that the State raised the good faith exception for the first time in its petition for rehearing (*supra* ¶ 105). But because the majority has now declared that "arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution" (*supra* ¶ 43), there was no basis for the State to have raised application of the good faith exception in its original briefs. For that reason, I find that the State's good faith exception argument was not forfeited. Although I find that this argument was not forfeited, I agree with the majority that sufficient grounds existed to grant Bass's motion to suppress based on the unlawful extension of the traffic stop (*supra* ¶ 73).

¶ 128 I believe the State should be afforded an opportunity to argue the valid points it raised in its petition for rehearing relating to the majority's declaration of the unconstitutionality of investigative alerts under the Illinois Constitution. Consequently, I must respectfully dissent from the supplemental opinion, and I would allow the State's petition for rehearing.

¶ 129                                      Appendix

Illinois cases mentioning investigative alerts in facts:

*People v. Davison*, 2019 IL App (1st) 161094, ¶ 21

*People v. Middleton*, 2018 IL App (1st) 152040, ¶ 11

*People v. Evans*, 2017 IL App (1st) 150091, ¶¶ 5-6

*People v. Thomas*, 2016 IL App (1st) 141040, ¶ 13, *vacated*, No. 121947 (Ill. Sep. 27, 2017)

*People v. Randall*, 2016 IL App (1st) 143371, ¶ 15

*People v. Robinson*, 2016 IL App (1st) 130484, ¶ 18

*People v. Abram*, 2016 IL App (1st) 132785, ¶ 19

*People v. Brock*, 2015 IL App (1st) 133404, ¶ 7

*People v. Thompson*, 2015 IL App (1st) 122265, ¶ 7

*People v. Rankin*, 2015 IL App (1st) 133409, ¶ 8

*People v. Lewis*, 2015 IL App (1st) 130171, ¶ 6

*People v. Lewis*, 2015 IL App (1st) 122411, ¶ 22

*People v. Wilson*, 2014 IL App (1st) 113570, ¶ 11

*People v. Alicea*, 2013 IL App (1st) 112602, ¶ 9

*People v. Flynn*, 2012 IL App (1st) 103687, ¶ 10

*People v. Walker*, 2012 IL App (1st) 083655, ¶¶ 5, 16-17

*People v. Wilborn*, 2011 IL App (1st) 092802, ¶¶ 19, 25

*People v. Peters*, 2011 IL App (1st) 092839, ¶ 16

*People v. Nugen*, 399 Ill. App. 3d 575, 583 (2010)

*People v. Aguilar*, 396 Ill. App. 3d 43, 48 (2009)

*People v. Cotton*, 393 Ill. App. 3d 237, 246 (2009)

*In re Dante W.*, 383 Ill. App. 3d 401, 408 (2008).

Illinois cases mentioning investigative alerts in analysis of other issues:

*People v. Velez*, 388 Ill. App. 3d 493, 504 n.3 (2009) (Defendant argued that counsel was ineffective for failing to move to suppress based on lack of probable cause; in support defendant attached investigative alert to appendix, which court declined to consider because it was not part of the record)

*People v. Echols*, 382 Ill. App. 3d 309, 320-21 (2008) (testimony about investigative alert does not support defendant's argument that State improperly elicited evidence from which jury could infer that he was in a gang)

*People v. Cox*, 377 Ill. App. 3d 690, 701 (2007) (investigative alert mentioned, but not analyzed, as part of defendant's argument that State elicited improper hearsay about a phone call that led to a photo array being generated).

___

**No. 1-16-0640**

___

| | |
|---|---|
| **Cite as:** | *People v. Bass*, 2019 IL App (1st) 160640 |

___

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-15846; the Hon. Neera Lall Walsh, Judge, presiding. |

___

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Brian L. Josias, of State Appellate Defender's Office, of Chicago, for appellant. |

___

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |

___