2025 IL App (1st) 240357-U

No. 1-24-0357

Order filed September 30, 2025

SECOND DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Respondent-Appellee, | ) ) | No. 09 CR 10295 01 |
| v. | ) ) | Honorable |
| ODILON PETATAN, | ) ) | Joanne Rosado, Judge Presiding. |
| Petitioner-Appellant. | ) | |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant's postconviction petition was timely and he received reasonable assistance from postconviction counsel, but he failed to establish a substantial claim of a violation of his constitutional rights.

¶ 2     Defendant Odilon Petatan (Defendant) was convicted of two counts of attempted murder and two counts of aggravated battery with a firearm and sentenced to 35 years' incarceration on July 2, 2013. Defendant's direct appeal was unsuccessful and his initial postconviction petition was dismissed at the second stage because it was untimely and failed to make a

substantial showing of a constitutional violation. Defendant appeals that dismissal, arguing that his petition was timely because his claim only became available after a change in the law, that his arrest based on an investigative alert violated his rights under the Illinois Constitution, and that his postconviction counsel failed to provide him with reasonable assistance. We affirm the circuit court's dismissal of defendant's postconviction petition.

¶ 3                                I. BACKGROUND

¶ 4        Our order affirming defendant's convictions on direct appeal provides a greater degree of detail on the events surrounding and constituting the offenses than we will provide herein, as those details are unnecessary to our review of defendant's postconviction petition. *People v. Odilon Petatan*, 2015 IL App (1st) 132522-U.

¶ 5                                   A. Trial

¶ 6        Teresa Bucio (Teresa) testified that on May 19, 2009, she was walking along Wood Street in Chicago with her husband, Armando Bucio (Armando). They were passing out fliers for their martial arts studio as they walked, and Armando stopped briefly to hand fliers to two individuals while Teresa continued walking. Teresa heard several gunshots and fell to the ground, having been shot in the back. She was transported to Stroger Hospital, treated, and released later the same day.

¶ 7        Armando testified that he was 15 to 20 feet from a green van when he heard the gunshots from its direction. He saw the vehicle because a woman, who later came to Teresa's aid, had screamed and thrown a rock at the van just before the shots rang out. Armando saw two individuals in the vehicle and relayed what he saw to the police. Armando was shown two lineups; in one, he identified the driver, but the other did not result in an identification. Armando stated that his view of the other occupant of the van was blocked "by the shooter."

Armando later confirmed that he had seen the driver, but clarified that he was never able to see the shooter, though he was certain there were two individuals in the van.

¶ 8     Officer Maria Higgs testified that she was patrolling on that same day when she received a radio dispatch regarding the shooting. She arrived at the scene two minutes later and saw Teresa lying on the sidewalk. She also saw that another individual, Noe Garcia (Garcia), was bleeding from a bullet wound to the leg.

¶ 9     Cindy Giron (Giron) testified that she was walking home on 21st Street when she stopped briefly at its intersection with Wood Street. She saw a green van stop at the intersection approximately eight feet away from her, and she heard someone inside the vehicle scream "there they go" in Spanish. Someone inside the van pointed across the street to where Garcia, who was a high school classmate of Giron's, was standing near an older couple. She then looked back toward the van and saw a chrome handgun emerging from the front passenger-side window. Giron testified that she attempted to frighten the individuals away from the intersection by throwing a brick at the van, which broke the rear passenger-side window. Giron saw the passenger fire three or four gunshots at the group.

¶ 10    Later the same day, Giron identified the van. She returned to the police station the following day to view a photo array, in which she identified defendant as the shooter. Three days after the photo array was conducted, Giron returned to the police station again and identified defendant in a lineup. Giron acknowledged, on cross-examination, that she provided a signed statement to police stating that she had not seen the shooter and had not seen a weapon in anyone's hand. Giron testified that her motivation for telling the police she did not see a weapon or the shooter was a fear of retaliation.

3

¶ 11        Officer Anthony Simulis (Simulis) was informed of the shooting before he began his shift on May 19, 2009. Around 8 p.m. that night, Simulis saw a green van with a broken window, so he began to follow it. Simulis activated his lights to conduct a stop, but the green van did not stop immediately. The van increased in speed and made two turns before another police vehicle cut it off and ended the pursuit. Richard Calderon (Calderon), who was driving the van, was arrested.

¶ 12        Calderon testified that although he was a member of the La Raza street gang, he had been inactive as a member since 2000. He stated that individuals never leave the gang due to fear of attacks on themselves or family members by rival gang members. Calderon knew defendant from growing up in the same neighborhood. Defendant was also a member of the La Raza gang when Calderon was still an active member.

¶ 13        At around 4 p.m. on the day of the shooting, Calderon was driving home from work in his father's green van when he saw defendant at the intersection of Loomis Street and Cullerton Street. Calderon stopped in the street to speak with defendant through the passenger-side window about "what was going on with the LaRaza's [sic] in the area." Defendant entered the van and sat in the passenger seat.

¶ 14        After driving for another ten minutes, Calderon saw an individual approaching the driver's side of his vehicle when he was near the intersection of 21st Street and Wood Street. Calderon was aware that the area was associated with the Ambrose street gang, and he was afraid that the individual would throw something at the van. Calderon heard a window on the passenger side of the van break, "and also heard gunshots." Calderon drove away, fleeing the area. When Calderon looked over to the passenger seat, he saw defendant pulling a chrome

revolver in through the passenger window. Calderon asked defendant why he had fired the weapon, but defendant did not respond.

¶ 15        Calderon drove home, where he got out of the van and discovered that there was a large brick inside the van. Defendant emptied the spent shells from his handgun, placed the handgun on the driver's seat of the van, and told Calderon he was leaving. Calderon told him to take the gun with him, but defendant did not comply and departed on foot. Calderon placed the handgun in a can on a shelf in his garage, then left in the van to get the window repaired. While he was out, he was stopped by the police and taken to the Area 4 police station.

¶ 16        Calderon admitted to the police that he had been drinking beer and was mildly intoxicated. He gave the police defendant's first name and identified him in a photograph. Calderon also informed the police of the location of the handgun and agreed to go with the police to search the garage and retrieve the handgun. However, the handgun was not where Calderon allegedly left it. Lorena Calderon, his wife, testified that she took the handgun from the garage and gave it to a neighbor who had previously hidden Calderon's own handgun. After learning this, an officer was dispatched and recovered two handguns from the neighbor's oven: a semiautomatic pistol and a chrome revolver.

¶ 17        Officer Jon Mikuzis (Mikuzis) testified that on May 23, 2009, he received a photograph and information on a potential suspect in the shooting. Later that day, he observed defendant near an abandoned building on 19th Street. Mikuzis approached defendant and made eye contact, at which point defendant fled into the three-story building. Mikuzis pursued and detained defendant on the top floor of the building.

¶ 18    Officer Robert Goerlich testified, without objection, about the gang-related nature of defendant's tattoos. Various experts testified, establishing that Teresa and Garcia suffered bullet wounds, that the bullet recovered from Garcia matched the chrome revolver recovered from Calderon's neighbor's oven (the other bullet was left inside Teresa due to proximity to her spine), and that there was gunshot residue on the front passenger-side door of Calderon's van.

¶ 19    The jury found defendant guilty of two counts of attempted first degree murder and two counts of aggravated battery with a firearm. Defendant filed a motion for a new trial alleging ineffective assistance of counsel on numerous grounds. The court denied that motion, and on July 2, 2013, subsequently sentenced defendant to two concurrent 35-year sentences for the attempted first degree murder charges. Defendant's aggravated battery with a firearm charges were merged into the attempted murder convictions.

¶ 20    B. Direct Appeal

¶ 21    On direct appeal, defendant reraised his ineffective assistance claims and additionally argued that he was prejudiced by the late tendering of a document summarizing various statements from Calderon throughout the police investigation, that the court erred in failing to investigate claims that some jurors were sleeping during the trial, and that the court erred by denying defendant's motion for a mistrial based on improper comments from the State during closing arguments. On March 20, 2015, this court entered an order finding no merit to defendant's claims and affirming his convictions.

¶ 22    C. Postconviction Petition

¶ 23    On October 15, 2020, defendant filed the instant petition for postconviction relief. Defendant retained private counsel for the petition. Defendant's counsel confirmed to the

court that the petition was hers but noted that defendant "pretty much wrote it himself." The circuit court denied defendant's petition because it failed to satisfy the requirements of a successive petition but later struck that order and advanced the petition to second-stage proceedings after learning that it was defendant's first postconviction petition. This petition alleged that defendant's fourth and fourteenth amendment rights were violated when he was arrested pursuant to an investigatory alert, and because that alert was based on testimony from an intoxicated witness. Defendant raised the "evolving law exception" and cited to both *Hyland* and *Bass* for the alleged unconstitutionality of arrests based on investigative alerts. *People v. Hyland*, 2012 IL App (1st) 110966; *People v. Bass*, 2019 IL App (1st) 160640.

¶ 24        Defendant's counsel suffered health issues that prevented her from continuing with the case, and the court appointed an attorney for defendant. Defendant's assigned counsel submitted a supplemental petition that added an additional argument that defendant's arrest pursuant to an investigatory alert violated defendant's due process rights under the Illinois Constitution. Ill. Const. 1970, art. I, § 6. Defendant's postconviction counsel signed a certificate confirming fulfilment of her responsibilities under Illinois Supreme Court Rule 651(c). Ill. S. Ct. R. 651(c) (eff. July 1, 2017). It alleged that Mikuzis arrested defendant based only on a photograph and "information regarding a possible suspect in the shooting at issue." The petition asserted that because there was no warrant for defendant's arrest, his arrest was based solely upon the investigative alert, without "a judicial determination of probable cause."

¶ 25        On October 20, 2023, the State moved to dismiss the petition because (1) defendant's postconviction petition was untimely, as it was due October 24, 2015, and (2) defendant's constitutional claim lacked merit, since defendant's arrest was supported by probable cause

and because there was a division split in the appellate court regarding whether arrests based on investigative alerts were constitutional. On December 11, 2023, the court agreed with the State and found, without addressing the evolving law exception, that the petition was untimely and that the investigative alert was lawful. Defendant filed a timely notice of appeal on December 14, 2023, and the case now comes before us.

¶ 26                                II. ANALYSIS

¶ 27        On appeal, defendant argues that the postconviction court should not have dismissed his petition at the second stage because he made a substantial showing that his arrest based on an investigative alert violated his rights under the Illinois constitution. Defendant preemptively argues against a potential finding that the error was harmless and asserts that he was not culpably negligent for his petition being filed beyond the statutorily allowed period. In the alternative, defendant argues that his postconviction counsel provided unreasonable assistance by failing to modify his petition to allege sufficient facts to establish that he was not culpably negligent for the delay in filing the petition.

¶ 28        The case of *People v. Clark*, which addressed the constitutionality of arrests based on investigative alerts, was pending before our supreme court when defendant's opening brief was filed, and the decision was published before the State filed its response brief. *People v. Clark*, 2024 IL 127838. The State argues that *Clark* is directly on point and shows defendant's claims to be without merit. Defendant acknowledges in his reply brief that the *Clark* decision "undercuts" his claim, but he argues that his claim is distinguishable. Namely, defendant argues that (1) "[t]he investigative alert hinged on two witnesses who showed police that they lacked reliability" and the police did little additional investigation to verify the witnesses' claims, thereby creating a situation in which "probable cause is meant to be

decided by judges;" and (2) defendant's postconviction counsel nonetheless provided unreasonable assistance where the record "suggest[ed] that [defendant] took active steps to bring his claim" but his postconviction counsel did not include facts showing as much in his supplemental petition.

¶ 29    The Post-Conviction Hearing Act (the Act) "provides a method by which persons under criminal sentence can assert that their convictions were the result of a substantial denial of their federal or state constitutional rights." *People v. Urzua*, 2023 IL 127789, ¶ 32; 725 ILCS 5/122-1 *et seq.* (West 2018). "At the first stage of postconviction proceedings, the circuit court must independently review the postconviction petition and dismiss it if it is 'frivolous or is patently without merit.' " *Urzua*, 2023 IL 127789, ¶ 32 (citing 725 ILCS 5/122-2.1(a)(2) (West 2010)).

¶ 30    "At the second stage, counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or an answer to the petition." *People v. Domagala*, 2013 IL 113688, ¶ 33. "At this stage, the circuit court must determine whether the petition and any accompanying documentation make 'a substantial showing of a constitutional violation.' " *Id.* (citing *People v. Edwards*, 197 Ill. 2d 239, 246 (2001)). "During the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation." *Id.* ¶ 35.

> " 'At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations. The Act contemplates that such determinations

will be made at the evidentiary stage, not the dismissal stage, of the litigation. Due to the elimination of all factual issues at the dismissal stage of the post-conviction proceeding, a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law.' " *Id*. (citing *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)).

In the event that a petition is dismissed at the second stage, as in this case, we are presented with a pure question of law, and our standard of review is *de novo*. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). "[D]*e novo* consideration means that a reviewing court performs the same analysis that a trial judge would perform." *People v. Van Dyke*, 2020 IL App (1st) 191384, ¶ 41.

¶ 31                                             A. Timeliness

¶ 32       The State asserted in its motion to dismiss that defendant's petition was untimely. The Act grants a period of either 6 months or 3 years to file a postconviction petition, depending on the circumstances. 725 ILCS 5/122-1(c) (West 2018). In this instance, we need not concern ourselves with which of those deadlines applies to the instant petition, as its filing date of October 15, 2020 exceeds both potentially applicable allowances.

¶ 33       The Act permits the filing of a petition at any time after the allowed period if the petitioner "alleges facts showing that the delay was not due to his or her culpable negligence." *Id*. Defendant alleged in all iterations of his petition that he could not have filed his petition sooner because the law regarding investigative alerts was evolving and only allowed for his claim after this court decided *People v. Bass*, 2019 IL App (1st) 160640, ¶ 106. Defendant alleged no further facts to support his lack of culpable negligence. The question before us, then, is whether the nearly 15-month gap between the July 25, 2019

publication of *Bass* and defendant's October 15, 2020 petition is short enough a period of time to demonstrate a lack of culpable negligence.

¶ 34        Defendant cites three cases to support his contention that a "relatively short" delay after discovering the legal basis for one's claim does not constitute culpable negligence: *People v. Hernandez*, 296 Ill. App. 3d 349, 352 (permitting an 11-month delay after the relevant case was published); *People v. Wilburn*, 338 Ill. App. 3d 1075, 1077-78 (2003) (permitting a 16-month delay of the same type); and *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 30 (permitting an 8-month delay based on difficulties accessing the law library and transcripts). Although the delay of concern in *Upshaw* is of a different sort and therefore inapplicable, *Hernandez* and *Wilburn* are both quite similar to the case before us. The only reason for the *Wilburn* defendant's 16-month delay was a change in case law, just like this defendant. *Wilburn*, 338 Ill. App. 3d at 1077-78. Where cases have determined that a delay was long enough to signify culpable negligence those delays were longer than the one we consider here. *People v. Ramirez*, 361 Ill. App. 3d 450, 454 (2005) (27-month delay); *People v. Gerow*, 338 Ill. App. 3d 524, 530 (2009) (40-month delay). Accordingly, we find that defendant was not culpably negligent in his late filing, and we deem his petition timely.

¶ 35                    B. Unreasonable Assistance of Counsel

¶ 36        Defendant claims that his postconviction counsel failed to comply with the requirements of Illinois Supreme Court Rule 651(c) and therefore provided unreasonable assistance. Ill. Sup. Ct. R. 651(c) (eff. July 1, 2017). Defendant's unreasonable assistance claim is based wholly on postconviction counsel's failure to amend his petition to allege further facts to establish his lack of culpable negligence in the delay in filing his petition. The rule only requires postconviction counsel to make amendments to the petition "that are necessary for

an adequate presentation of petitioner's contentions." *Id*. As we have found that the petition adequately established a lack of culpable negligence, we cannot say postconviction counsel erred by failing to allege further facts in support of that argument. Furthermore, our supreme court has found that a brief assertion of the reason for the delay, alone, can be sufficient to establish a lack of culpable negligence. *People v. Perkins*, 229 Ill. 2d 34, 51 (2007). In that case, the court also held that a failure to allege further facts is too speculative a claim to warrant a finding that counsel failed to provide reasonable assistance when there is no evidence that such facts were available to allege. *Id*. As such, we find that defendant's postconviction counsel complied with the requirements of Rule 651(c) and provided reasonable assistance.

¶ 37                    C. Constitutionality of Arrests Based on Investigative Alerts

¶ 38        Defendant claims that his right to be secure against unreasonable seizures under the Illinois Constitution was violated because he was arrested without a warrant, based solely on an investigative alert issued three days prior. Ill. Const. 1970, art. I, § 6. Much of defendant's argument on this issue is inapt, as it discusses public policy and what the law "prefers" rather than what the law actually requires. The questionable nature of defendant's arguments is well-illustrated by his decision to cite first to the Supreme Court's decision in *Gertrude v. Pugh*, 420 U.S. 103 (1975). The Supreme Court stated in that case that the issue of probable cause should be decided by a neutral magistrate when possible, but it also noted that "while the Court has expressed a preference for the use of arrest warrants when feasible, it has never invalidated an arrest supported by probable cause solely because officers failed to secure a warrant." *Id*. at 113. The utility of the language of *Gertrude* to an argument against the validity of warrantless arrests as a whole is not coincidental, as the seminal case regarding

12

the constitutionality of warrantless arrests, *United States v. Watson*, was decided the following year. *United States v. Watson*, 423 U.S. 411 (1976). Defendant acknowledges the *Watson* decision but nonetheless cites repeatedly to pre-*Watson* cases for support. Rather than disregarding nearly fifty years of precedent, we will focus on those portions of defendant's arguments that are cognizable within the modern legal landscape.

¶ 39    In describing the Chicago Police Department's investigative alert system, defendant states that the procedure allows for two types of investigative alerts: those based on probable cause and those not based on probable cause. Defendant states that officers are permitted by the policy to conduct arrests pursuant to alerts that are based on probable cause, but makes no assertion that arrests are permitted based on investigative alerts for which officers do not claim to possess probable cause. Defendant argues that, for various reasons, officers "had reason to doubt Calderon," from whose testimony the officers derived their probable cause. This, however, is not an argument about the constitutionality of investigative alerts, but an argument that the officers lacked probable cause to justify arresting defendant. Because that issue could have been raised on direct appeal, it is forfeited. *People v. English*, 2013 IL 112890, ¶ 22 (citing *People v. Ligon*, 239 Ill. 2d 94, 103 (2010)).

¶ 40    Defendant argues that the Illinois Constitution's provision that "[n]o warrant shall issue without probable cause, supported by affidavit" offers broader protection than the U.S. Constitution's language establishing that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation." U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Defendant argues that the difference in language between these two constitutional provisions is sufficient to warrant breaking from the limited lockstep doctrine, under which we will construe the Illinois Constitution as providing greater protection than the U.S. Constitution

when we can find "in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." *People v. Caballes*, 221 Ill. 2d 282, 297 (2006) (citing *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)). Defendant cites such language, as it was used in the now-overruled *Smith* decision, but that language only supports the contention that the drafters of the Illinois Constitution willfully chose to require a written affidavit rather than the broader language of the U.S. Constitution, under which one could rely on a verbal oath alone. *People v. Smith*, 2022 IL App (1st) 190691, ¶¶ 80. Even interpreted to maximally favor defendant, the cited language only governs when an arrest warrant may be issued, not, more broadly, when an arrest may be conducted.

¶ 41    Defendant asserts that the investigative alert system is "just like" the standing order policy struck down in *People v. McGurn*, 341 Ill. 632 (1930). Not only did *McGurn* precede the Supreme Court's explicit condoning of warrantless arrests in *Watson* by some 46 years, it also concerned an arrest made by an officer who knew nothing at all beyond the identity of a man and the fact that his superior officer had issued a standing order to arrest that man. *Id*. at 635. Further, it has been established and reiterated by our supreme court that "[w]hen officers are working in concert, probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest." *People v. Buss*, 187 Ill. 2d 144, 204 (1999).

¶ 42    Defendant relied on this court's decision in *Smith* for the assertion that where police have time to seek a warrant from a magistrate, as in the three-day span in the case before us, they must do so rather than conduct a warrantless arrest based on probable cause. *Smith*, 2022 IL

App (1st) 190691, ¶ 98. However, defendant's brief was drafted when our supreme court had not yet decided *People v. Clark*, which explicitly rejected the reasoning of both *Smith* and *Bass*. *People v. Clark*, 2024 IL 127838, ¶ 55. *Clark* stated clearly and unequivocally that "once it is accepted that warrantless arrests for felonies do not violate the Illinois Constitution, there is no basis to hold that arrests pursuant to investigative alerts violate the Illinois Constitution." *Id*. ¶ 63. In short, where an investigative alert is based on probable cause, even if that probable cause is derived from the collective knowledge of numerous police officers, a warrantless arrest of the individual sought is not at odds with either the Illinois Constitution or the U.S. Constitution.

¶ 43       As *Clark* was decided between the filing of defendant's opening brief and the filing of the State's brief, defendant attempts to distinguish this case from *Clark* in his reply brief. The reply brief focuses entirely on 1) the alleged unreliability of Calderon and Giron as witnesses and 2) defendant's unreasonable assistance claim. We have already dispensed with the latter and, as we have established, the former is an argument about whether the officers possessed probable cause, not about the constitutionality of arrests based on investigative alerts.

¶ 44       Lastly, defendant points out that the *Clark* decision declined to address an argument that concerned "the structure of the investigative alert system" as a "parallel internal proxy warrant system that is unconstitutional because it fails to comply with necessary warrant procedures, such as the requirement of an affidavit presented to a neutral and detached magistrate." *Clark*, 2014 IL 127838, ¶ 37. Our supreme court declined to address the argument for lack of evidence in the record about the structure of the system. *Id*. ¶ 38. Defendant admits that he similarly did not provide a record to support such a claim, but he urges that we remand the case so that he may supplement the record with such evidence. In

effect, defendant asks that we give him another bite at the apple because, in view of recent caselaw, he would have approached his petition differently. He cites no precedent to suggest that such a remand is either permissible or warranted. It may be that defendant's intention is that we should remand for a third-stage evidentiary hearing on his undeveloped argument, but were that the correct decision here, it would have also been the correct decision in *Clark*, where the same argument was similarly undeveloped. As our supreme court declined to do so in *Clark*, we decline to do so here.

¶ 45    Given that the developed portion of defendant's unlawful arrest claim relied on arguments that have since been explicitly rejected by *Clark*, we cannot say that defendant made a substantial showing of a constitutional violation. As such, we affirm the circuit court's second-stage dismissal of defendant's postconviction petition.

¶ 46                           III. CONCLUSION

¶ 47    For the foregoing reasons, we affirm the circuit court's dismissal order.

¶ 48    Affirmed.